MADDOX, Justice.
Appellant Lakeshore Drive Recreation Club, Inc., appeals the granting of summary judgment in favor of appellee United States Fidelity and Guaranty Company (USF&G). For the reasons hereinafter set forth, we reverse and remand.
I
On August 3, 1973, Southeast Contractors, Inc., a highway construction company, entered into a construction contract with the State of Alabama for the widening and altering of 15th Street East in Tuscaloosa. Under the terms of this contract, Southeast was required to carry at least $100,000 in liability insurance to cover all damages arising out of injury to or destruction of any public or private property. In addition, Southeast was required to restore in an acceptable manner all property, public and private, damaged incident to the prosecution of the work.
In compliance with these contractual provisions, Southeast secured a series of one-year liability insurance policies from USF&G and executed a performance bond with Travelers Indemnity Company. The USF&G policies contained specific provisions requiring the insured to notify USF&G in the event of an “occurrence,” the making of a “claim,” or the filing of a “suit.” An “occurrence” was defined under the policy as “an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured.” The notice provisions were as follows:
4. Insured’s Duties in the Event of Occurrence, Claim or Suit
(a) In the event of an occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Company or any of its authoritized [sic] agents as soon as practicable.
(b) If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.
Furthermore, the policy expressly provided that:
No action shall lie against the Company unless as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insured’s obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.
On August 30,1973, Southeast began construction on 15th Street East. Almon & Associates, Inc. was the designated Project Engineer, with Robert Almon as the “principal in charge” of construction. As the work progressed, Lakeshore Drive Lake, a small lake located approximately one city block from 15th Street East, began to deteriorate as a result of erosion and siltage buildup caused by the construction. These siltage problems were noticed as early as September of 1974 when Scott Bonner, an employee of Almon & Associates, had numerous discussions with Benton Andrews, the project superintendent for Southeast, concerning the serious damage to Lake-shore Drive Lake. On February 17, 1975, Almon received a letter from Joe Shepherd, the president of appellant Lakeshore Drive Recreation Club, in which Shepherd alluded to the Club’s “claim” against Southeast for damages to Lakeshore Drive Lake, and requested that Southeast either restore the lake to its previous condition or pay the Club damages in an amount sufficient to restore the lake. Pursuant to that letter, Almon inspected the construction site and instructed Southeast not to take any action until the project was satisfactorily grassed and further erosion prevented. Almon suggested that after the project was completed Southeast should take appropriate action to remove the sediment from the lake.
*280 On February 20, 1976, the project was officially completed and accepted by the State except for the restoration of Lake-shore Drive Lake. Bobby J. Kemp, Division Engineer for the Division Office of the State Highway Department, formally notified the Club of this limited acceptance by letter dated April 9, 1976. In addition, Kemp notified Southeast that the State was withholding approximately $130,000 in re-tainage pending the satisfactory restoration of the lake.
On April 6, 1976, Mrs. Joseph Shepherd, who succeeded her husband as president of Lakeshore Drive Recreation Club, forwarded a letter to Southeast in which she stated that the grassing of the project was complete and she requested that Southeast begin restoration of the lake as soon as possible. In that letter Mrs. Shepherd expressly stated that “Lakeshore Recreation Club hereby files its claim against Southeast Contractors, Inc. for damages to its lake caused by excessive silting originating from construction of Fifteenth Street East in Tuscaloosa, Alabama”; however, no civil action was actually filed.
In May of 1976, Southeast moved equipment to the lake and initiated dredging efforts to clean out the silt. When these dredging efforts met with very little success, a dragline had to be brought onto the project. In late 1976, Southeast advised Frank House of Engel-House Insurance of the serious problems it was having with the lake. Engel-House was both the general independent agent authorized to represent USF&G and the area representative for Travelers Indemnity Company. In an affidavit, House stated that he believed Southeast contacted him “not for the purpose of inquiring about the possibility of coverage for the matter under any of the [USF&G] liability policies, but, rather, ... for the purpose of looking into the possibility of coverage for the matter under the Travelers Performance Bond.”
In March of 1977, Southeast met with various club members, city officials and highway department officials concerning the restoration problems. At this meeting, James W. Riley, Southeast’s attorney, stated that Southeast would not do any more work in restoring the lake because it had already removed more silt than it put in. The State evidently concurred in this determination because it released the retainage due and owing Southeast. Thereafter, the Club’s attorney, Kathryn Rossback, wrote a letter to Southeast stating that the Club’s “claim is again filed.” It was not until June of 1977, that Mrs. Rossback contacted USF&G.
Suit was eventually filed against Southeast on July 26, 1977. Southeast transferred the defense of these cases to USF&G, which declined coverage on the ground that, among other things, Southeast had breached the policy provisions requiring prompt notice of any occurrence, claim or demand. Southeast agreed that it had violated the notice provisions of the policies and, therefore, concluded that denial of coverage by USF&G was both reasonable and valid.
A settlement was eventually negotiated between Southeast and the Club, with a consent judgment being entered against Southeast in the amount of $21,000. When Southeast subsequently became insolvent, the Club proceeded against USF&G on the insurance policies, Travelers on the performance bond and Ray Bass (acting Highway Director for the State of Alabama) for negligently releasing to Southeast money (i. e., the retainage) in which the Club held an interest. USF&G filed a motion for summary judgment which was granted by the trial court pursuant to Rule 54(b), ARCP. The trial court concluded that there was no genuine issue of material fact and that USF&G was entitled to judgment as a matter of law because Southeast breached the notice provisions of the policies.
II
This appeal is limited to the resolution of a single issue, viz., whether the trial court erred in granting USF&G’s motion for summary judgment. The trial court concluded that since Southeast failed to promptly inform USF&G of either the initial damage to the lake (which constituted an “occur *281 rence”) or the Club’s repeated “claims” and demands, it failed to notify USF&G as expressly required under the liability policies and, therefore, precluded the possibility of insurance coverage in the very first instance. The court expressly held that Southeast’s action was “unreasonable as a matter of law,” there being no excuse or justification for the delay in giving notice.
Assuming arguendo that the siltation of the lake is the only possible “occurrence” involved in the instant case, we would agree with the trial court that Southeast was guilty of a failure to give timely notice. It is obvious that Southeast was fully aware of the damage to Lakeshore Drive Lake as early as September, 1974, and was, likewise, apprised of the Club’s “claim” for damages as early as February, 1975. Notwithstanding these facts, USF&G was not informed of Southeast’s potential liability until it received Mrs. Rossback’s letter in June of 1977, over two years later. The Club strongly argues that its discussions with House in May of 1976 constituted constructive notice to USF&G because he was the general independent agent authorized to represent USF&G. Nevertheless, it is clear from House’s affidavit and from letters directed to him that he was contacted by Southeast and Mrs. Rossback as bonding agent under the Travelers performance bond. This notice, therefore, did not constitute notice to USF&G because notice acquired by an agent while pursuing some other person’s business is not constructive notice to his principal. See, Florence v. Carr, 226 Ala. 654, 148 So. 148 (1933); Girard Fire & Marine Ins. Co. v. Gunn, 221 Ala. 654, 130 So. 180 (1930). In view of these facts, the trial court properly concluded that Southeast breached the notice provisions of the insurance policies as concerns the original damage to Lakeshore Drive Lake. Since the Club currently stands in the shoes of the insured in seeking to recover under the USF&G policies, it is bound by Southeast’s dilatory action; however, USF&G was not entitled to summary judgment unless, on the basis of relevant information presented to the trial court, it proved that there was lacking any discerna-ble circumstances under which the nonmov-ing party (the Lakeshore Club) might be able to recover. Ex parte Bagby Elevator & Electric Co., 383 So.2d 173 (Ala.1980); Ragland v. Alabama Power Co., 366 So.2d 1097 (Ala.1978). Upon reviewing the evidence presented to the trial court (i. e., the pleadings, affidavits, letters, answers to interrogatories, contract forms, etc.), we hold there are alternative circumstances under which the Club might be able to recover and, therefore, conclude that summary judgment was inappropriate.
Ill
Under the terms of its contract with the State of Alabama, Southeast was required to carry, without extra compensation, liability insurance in accordance with the Alabama State Highway Department’s standard specifications for highways and bridges. These standard specifications establish standard provisions for general liability policies and include specific instructions for the preparation of insurance policies by companies. The standard property damage liability provisions contemplate insurance coverage as follows:
To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of physical injury to or destruction of property, including loss of use of any property due to such injury or destruction, hereinafter called “property damage” arising out of acts or omissions at the designated job site which are related to or are in connection with the work .... [Emphasis supplied.]
In the general instructions for usage of the standard insurance form including these provisions, it is expressly provided that the form is “expressed in standard language which may not be amended and no part of which may be omitted. ...” [Emphasis supplied.] Thus, Southeast was required by the terms of its contract to procure adequate liability insurance to cover any property damage resulting from any act or omission incident to the prosecution of the *282 work. In purported compliance with these provisions, Southeast procured liability insurance with USF&G.
We believe that in the instant case an omission incident to the work may have occurred if USF&G failed to satisfactorily restore the lake. As noted previously, Southeast’s contract with the State, in conformity with the standard specifications for highways and bridges, required Southeast, as a part of the final cleaning up, to restore in an acceptable manner all property damaged incident to the prosecution of the work. Furthermore, the contract provided that “[w]hen any damage is done to public or private property by or on account of any act, omission, or negligence of the Contractor he shall make good such damage in an acceptable manner.” Therefore, the restoration of the lake was within the scope of the work. This is even more certain in view of the fact that the State conditionally accepted the project pending the restoration of the lake. If Southeast failed to acceptably restore the lake, this could constitute an omission incident to the prosecution of the work which, according to the contract’s standard insurance provisions, may be included in the coverage under the liability insurance policies; therefore, there exists an alternative set of circumstances under which USF&G may be responsible for liability insurance coverage. Although USF&G is not responsible for damages accompanying the original siltation of Lakeshore Drive Lake, it may be liable for damages for failing to restore the lake.
USF&G argues that it is not responsible for any omission in the restoration of the lake because there is no identifiable “occurrence” to which coverage would apply. USF&G argues that since an “occurrence” is defined under the insurance policies as an accident which results in property damage which is neither expected nor intended from the standpoint of the insured, Southeast’s intentional cessation of restoration efforts will not constitute an “occurrence,” and hence, coverage. USF&G’s argument is based upon the Club’s theory of liability that “the insurance policy in question” is exclusively the one which commenced February 6, 1977, and ended February 6, 1978. USF&G, in its brief, stated:
In its brief, Lakeshore Drive Recreation Club, Inc. (“Lakeshore”) appears to have elected to put all of its eggs into one basket with an attempt to accomplish a reversal on the theory that “the insurance policy in question” is exclusively that one which commenced February 6, 1977 and ended February 6, 1978, and that, therefore, neither the happening of an “occurrence” prior to that time nor the making of a “claim” and the insured’s receipt of a “demand” or “notice” relating thereto prior to that time would have any effect on coverage under the policy. Time and time again throughout its brief, Lake-shore emphasizes that this is its theory of the case.
USF&G is correct in assessing the Club’s theory of liability. In its original brief, the Club argued:
There wasn’t any delay! The defendant in this case knew about the restoration efforts on the lake at the time it issued the policy in question. The restoration work on the lake was going at the time that the policy was issued and the defendant knew that. All of the defendant’s contentions concerning knowledge by Southeast of its damage to Lakeshore Drive Lake in 1975, and in 1976, are moot. The defendant knew that the only work being done on this project was the restoration of the lake at the time the policy was issued. At least that’s the logical inference, as the project was accepted by the State shortly after the defendant issued the insurance policy in 1976, and, if the defendant was businesslike at all in its operation, it should have known what it was insuring in 1977.
The General Agent knew about the work to restore the lake and had had frequent conversations with the President of Southeast Contractors, the insured, about it for months before the policy in question was written. (House affidavit page 67).
* * * * * *
*283 The policy was issued on February 6, 1977, at which time the restoration work on the lake was going on and had been going on for months and on March 17, a little over a month later Southeast Contractors stopped work, contending that it had taken out at that time more silt than they had put in the lake (Rossback affidavit — Tr. 57). Southeast was supported in its contention by the Division Engineer for the State of Alabama, B. J. Kemp, presently Highway Director for the State of Alabama.
At the time Southeast pulled out from its operation, Frank House, General Agent for the defendant, was notified by the President of Southeast Contractors. (Affidavit of Norman Reid — Tr. 87).
On April 26th, 1977, Agent for USF&G, Frank House, was notified by letter from the attorney for the plaintiff. (Rossback Affidavit P. 58).
On June 13, 1977, the defendant was notified by certified mail at its Baltimore office of the fact that Southeast Contractors had stopped work. (Rossback affidavit, Exhibit C Page 62 of the transcript.) Suit was filed on September 5, 1977, and the suits were then turned over to the defendant by Southeast Contractors (Exhibit A to answers to interrogatories Tr. 19).
It is obvious from the circumstances of this case that there was no delay in notification and that not only was there no delay in notification but that the policy was issued to cover the very work that was going on. Now the defendant is trying to escape liability claiming that they did not know about it!
It is plaintiff’s position that there was not only no delay in notification, but there was nothing about which notification could be given under the circumstances of this ease until Southeast stopped clean out operations on March 17, 1977. Up until that time Southeast was performing the only work for which the defendant had issued liability insurance to cover.
USF&G had issued liability policies which were in effect when the siltage initially occurred. Because of this fact, USF&G claims that the Club’s theory of limiting coverage to the policy issued in 1977 creates a dilemma. In brief, USF&G describes what it contends is the Club’s dilemma, as follows:
Having adopted this approach as its theory of the case, the Appellant may thereby escape forfeiture of any available coverage on account of tardy notice, but it does so at the expense of establishing a complete absence of such coverage in the first instance. This is because no “occurrence” for which coverage would be available took place after the February 6,1977 commencement of the policy’s coverage. As of that date the project had been grassed and accepted by the State for almost an entire year and the abandonment of the clean-up effort was announced only 33 days after this policy went into effect.
USF&G’s argument sounds plausible, and a jury or trier of fact, may agree with its interpretation of the policy provisions, but we cannot conclude, as a matter of law, under all the circumstances of this case, that the insured was not under a duty to remove the silt from the lake and restore it, or that it did not breach that duty when it omitted to do what it should have done under the terms of the public works contract, or that as a proximate result of that failure the Club was not damaged, or that the injury suffered was not covered, because it was not within the reasonable expectancy of both contracting parties that it should be covered.
In other words, a trier of fact could conclude that Southeast ended its restoration work because it believed it had already removed more silt than it had put in, and if it erred in this determination or, in some other manner, failed to acceptably restore the lake, an “omission” would have occurred resulting in property damage which Southeast did not intend or expect. Accordingly, we hold that there are circumstances under which appellant Club might be able to re *284 cover; therefore, the trial court’s entry of summary judgment is due to be reversed and remanded.
REVERSED AND REMANDED.
JONES, SHORES, BEATTY and ADAMS, JJ., concur.
TORBERT, C. J., and FAULKNER and EMBRY, JJ., dissent.
ALMON, J., recused.