711 So.2d 984 (1998)
Ex parte David DICKINSON and Sandra Dickinson.
(Re David DICKINSON and Sandra Dickinson v. CHRIS MYERS PONTIAC-NISSAN-GMC, INC., et al.).
1961017.
Supreme Court of Alabama.
February 13, 1998.
Rehearing Overruled March 20, 1998.
Opinion Dissenting from Overruling of Rehearing March 20, 1998.
*985 L. Daniel Mims and James A. Johnson of L. Daniel Mims, P.C., Mobile, for petitioners.
David P. Shepherd and Mark S. Gober of Law Offices of David P. Shepherd, Fairhope, for respondents.
COOK, Justice.
David Dickinson and Sandra Dickinson petition for a writ of mandamus directing Judge Douglas I. Johnstone of the Mobile Circuit Court to vacate an order compelling arbitration of a dispute between the Dickinsons and Chris Myers Pontiac-Nissan-GMC, Inc. ("Chris Myers"). We grant the petition in part and deny it in part.
In January 1996, the Dickinsons, husband and wife, began negotiating with employees of Chris Myers for the purchase of a new automobile. On January 25, 1996, the parties reached an agreement, according to which the Dickinsons would trade in their 1983 Buick Regal, with a trade-in value of $2200, on the purchase of a 1996 Nissan Sentra.
The Dickinsons were then presented with a number of form documents to complete. Those documents included a "Retail Installment Sales Contract" and a "Retail Buyer's Order." The Retail Installment Sales Contract *986 included the negotiated terms, such as the descriptions of the vehicles; the price of the new vehicle; the trade-in value of the old vehicle; the amount to be financed; the annual percentage rate for the interest on the loan; the amount and number of installment payments; and the total amount of the payments. The Retail Installment Sales Contract also provided that the contract would be assigned to Aegis Auto Finance, Inc. ("Aegis"), for financing of the purchase. It was signed by both David and Sandra Dickinson.
The Retail Buyer's Order contained some of those terms, namely, the descriptions of the vehicles; the price of the new vehicle; the trade-in value of the old vehicle; and the difference in value between the trade-in and the new car. However, it differed from the Retail Installment Sales Contract in two significant respects. First, it contained something not found in the Retail Installment Sales Contractan arbitration clause. Second, the Retail Buyer's Order was signed only by David Dickinson. The Dickinsons left their Buick at Chris Myers and drove away in the new Nissan.
The events that followed this transaction and when they occurred are controverted. The Dickinsons state: "Several days later, [a Chris Myers employee] telephoned [them]... and asked them to bring in some additional documents relating to their financial condition and to sign some new paperwork. When questioned, [he] indicated that this was standard operating procedure and that there was no problem with the financing." Petition for Writ of Mandamus, at 4. Chris Myers states that it first telephoned the Dickinsons after it received notice from Aegis that Aegis had "rejected" the Retail Installment Sales Contract on the ground that the transaction was "over financed." Chris Myers also says that Aegis demanded "verification" of the Dickinsons' lease payments and their salaries.
The parties do agree that Mrs. Dickinson responded to the telephone call by visiting the Chris Myers dealership. The Dickinsons state that Mrs. Dickinson visited Chris Myers "to drop off the information that [was] requested." During that visit, she executed a second Retail Installment Sales Contract, which "correct[ed] the over financing on the original contract." Brief in Opposition to Petition for Writ of Mandamus, at 4.
The second Retail Installment Sales Contract, which, like the first, does not include an arbitration clause, contains signatures purporting to be those of David and Sandra Dickinson. The Dickinsons, however, contend that David Dickinson's signature on that document was forged by someone at Chris Myers.
The Dickinsons also state that some days later, they received another telephone call from Chris Myers, the caller this time "ask[ing] them to bring the [automobile] back to the lot so that Chris Myers could make some minor repairs to [it] while the paperwork was being processed." Petition for Writ of Mandamus, at 4. They further state:
"The Dickinsons obliged and returned the vehicle and [Chris Myers] gave them the use of a `loaner' car until the repairs were completed. Thereafter David Dickinson called the repair department on several occasions to see if the work was complete on the 1996 Nissan Sentra. On or about February 21, 1996, the repair department advised David Dickinson that he could come and pick up the vehicle. When he arrived at the repair shop [he] was met by a representative of Chris Myers who told him that he would not be allowed to pick the car up and [that] the whole deal was off. Chris Myers did not allow David Dickinson to pick up the 1996 Nissan Sentra [; it] kept the `loaner' car, and [it] never returned the 1983 Buick Regal trade-in vehicle to the Dickinsons."
Id. at 4-5.
Chris Myers, on the other hand, maintains that the Dickinsons "failed to provide the additional financial information requested by Aegis" and that, because of their "continued failure to provide the documentation required by Aegis, the contract was ultimately rejected." Brief in Opposition to Petition for Writ of Mandamus, at 4. Chris Myers says the Dickinsons were "asked to retrieve the nonfunctional 1983 Buick Regal which they had traded in when they attempted to purchase the 1996 Nissan Sentra automobile," *987 but that they refused to do so. Id. After several weeks, Chris Myers had the Buick towed away.
On July 29, 1996, the Dickinsons sued Chris Myers and certain of its employees, alleging fraud, breach of contract, conversion, and "wrongful repossession." On October 18, 1996, Chris Myers moved to compel arbitration of the dispute and to stay all proceedings and discovery. On February 21, 1996, the trial judge granted the motion to compel arbitration.
The Dickinsons filed their petition in this Court, asking for a writ of mandamus directing the trial judge to vacate the arbitration order. They contend (1) that the arbitration clause is not broad enough to encompass their claims alleging conversion of the trade-in vehicle and wrongful repossession of the new car; (2) that Chris Myers waived its right to compel arbitration; (3) that the trial court should allow discovery to proceed; and (4) that Sandra Dickinson, who did not sign a document containing an arbitration clause, should not be compelled to arbitrate her claims.

I. Scope of the Arbitration Clause
We disagree with the Dickinsons' contention that the arbitration clause is not broad enough to encompass their claims alleging conversion of the 1983 Buick and wrongful repossession of the 1996 Nissan. The Retail Buyer's Order provided in part:
"Buyer and Dealer agree that all claims, demands, disputes and controversies of every kind or nature that may arise between them concerning any of the negotiations leading to the sale of the vehicle, the terms and provisions of the sale, the performance or condition of the vehicle, or any other aspects of the vehicle and its sale shall be settled by binding arbitration.... Without limiting the generality of the foregoing, it is the intention of the Buyer and the Dealer to resolve by binding arbitration all disputes between them concerning the vehicle, its sale and its condition, including disputes concerning the terms and conditions of the sale, the condition of the vehicle, any damage to the vehicle, the terms and meaning of any of the documents signed or given in connection with the sale, any representations, promises or omissions made in connection with negotiations for or sale of the vehicle, or any terms, conditions or representations made in connection with the financing, credit life insurance, disability insurance, and vehicle service contract purchased or obtained in connection with the vehicle."
(Emphasis added.) The Retail Buyer's Order also contained the following provisions:
"If the purchase of the vehicle is being financed, Buyer understands that the sale is contingent upon obtaining approval of the financing by the financing agency. In the event that the vehicle has been delivered to Buyer but financing approval is not obtained, Buyer agrees to immediately return the vehicle to the Dealer."
For their 1983 Buick, the Dickinsons were credited $2200 on the purchase price of the new car. The value of the Buick represented a portion of the purchase price and was a natural and material aspect of the "negotiations leading to the sale of the vehicle," and represented one of the key "terms and provisions of the sale." As for the wrongful repossession claim, the Retail Buyer's Order expressly addresses the contingency of "financing approval" and specifically requires the buyer "to immediately return the vehicle to the Dealer" in the event the contingency fails. The "disputes" that have developed in this case are, therefore, precisely the sort of "controversies" that contracting parties such as these would expect to "arise between them" in regard to the right to possess and control a trade-in vehicle and in regard to the failure of the financing contingency. We conclude, therefore, that the Dickinsons' claims are within the scope of the arbitration clause in the Retail Buyer's Order.

II. Waiver
The Dickinsons' waiver argument also focuses on the manner in which Chris Myers gained and maintained control of the Nissan and the Buick, respectively. They quote from Companion Life Insurance Co. v. Whitesell Manufacturing, Inc., 670 So.2d 897, 899 (Ala.1995), the following rule:

*988 "It is well settled under Alabama law that a party may waive its right to arbitrate a dispute if it substantially invokes the litigation process and thereby substantially prejudices the party opposing arbitration. Whether a party's participation in an action amounts to an enforceable waiver of its right to arbitrate depends on whether the participation bespeaks an intention to abandon the right in favor of the judicial process and, if so, whether the opposing party would be prejudiced by a subsequent order requiring it to submit to arbitration. No rigid rule exists for determining what constitutes a waiver of the right to arbitrate; the determination as to whether there has been a waiver must, instead, be based on the particular facts of each case."
(Emphasis added.) The essence of the Dickinsons' waiver argument is that Chris Myers resorted to subterfuge to gain possession of the vehicles, and, by doing so, manifested "an intention to abandon the right" to arbitrate. Chris Myers should have, the Dickinsons suggest, "allowed the [Nissan] to remain in the possession of the Plaintiffs pending a resolution of any disputes among the parties by an arbitrator." Petition for Writ of Mandamus, at 13. They insist that "[t]he actions of the Defendants have resulted in prejudice to the Plaintiffs in that not only do the Plaintiffs not have the new vehicle they purchased, but, in addition, the trade-in vehicle used to make the purchase is ... in the possession of the Defendants or has been sold." Id.
The problem with the Dickinsons' argument is that it confuses self-help with "judicial process." The rule is that a party may waive the right to compel arbitration by "invok[ing] the litigation process" in lieu of arbitration. Companion Life Insurance Co., supra, 670 So.2d at 899. (Emphasis added.) The rule is not that a party waives the right by relying on the self-help process. By definition, self-help is not "judicial process," and we decline to extend the rule to encompass self-help. Thus, we conclude that Chris Myers had not waived the right to compel arbitration.

III. Discovery
The Dickinsons summarize their discovery argument as follows:
"The Plaintiff[s] should have the opportunity to conduct discovery so as to have a jury trial on the issue of the arbitrability of some or all of the claims ..., or at a minimum so as to allow the court to resolve what is anticipated to be disputed factual matters concerning the execution of the Buyer's Order and the two Retail Installment Sales Contracts, and the extent to which these contracts supersede each other."
Petition for Writ of Mandamus, at 18 (emphasis added). Chris Myers's response is that "[t]here is no factual issue with regard to the arbitrability of the claims set forth in the ... complaint." Brief in Opposition to Petition for Writ of Mandamus, at 24 (emphasis added). Indeed, the Dickinsons do not state, or even suggest, what specific facts, relevant to the issue of arbitrability, might be found during further discovery. In short, we decline to issue a writ of mandamus directing the trial judge to vacate his order compelling the arbitration of David Dickinson's claims.

IV. Sandra Dickinson's Claims
The claims of Sandra Dickinson, however, stand on different ground. The sole basis for Chris Myers's motion to compel arbitration was the arbitration clause in the Retail Buyer's Order, which was signed only by David Dickinson. Procedurally, therefore, the issue whether Sandra Dickinson, a nonsignatory, is bound by this arbitration clause is fundamentally different from the issues in other cases in which this Court has recently considered whether nonsignatories were bound; see, e.g., Ex parte Isbell, 708 So.2d 571 (Ala.1997), in which a nonsignatory was attempting to rely on an arbitration clause to compel a signatory of the contract to arbitrate the signatory's claims against the nonsignatory. Here, a signatory, Chris Myers, is attempting to compel a nonsignatory, Sandra Dickinson, to arbitrate.
The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, provides:

*989 "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
(Emphasis added.) By these express terms, the FAA preserves traditional principles of contract law. "It is hornbook contract law that someone who is not a party to a contract cannot be bound by the contract." Lakeshore Drive Recreation Club, Inc. v. United States Fidelity & Guaranty Co., 398 So.2d 278, 284 (Ala.1981) (Torbert, C.J., dissenting). "Therefore, `a party cannot be required to submit to arbitration any dispute he has not agreed to submit.'" Old Republic Ins. Co. v. Lanier, 644 So.2d 1258, 1260 (Ala.1994).
Procedurally, this case is postured identically with Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773 (2d Cir. 1995), in which the Court of Appeals for the Second Circuit refused to compel arbitration. Id. at 780. In that case, as in this one, the signatory was seeking to compel a nonsignatory to arbitrate. The court considered that procedural distinction to be an important factor. Id. at 779. After considering Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753 (11th Cir.1993), cert. denied sub nom., Sunkist Growers, Inc. v. Del Monte Corp., 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315 (4th Cir.1988); and McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342 (11th Cir.1984)cases that have been cited in dissenting opinions by Justices of this Court, see, e.g., Ex parte Stripling, 694 So.2d 1281 (Ala.1997)(Maddox, J., dissenting); Ex parte Martin, 703 So.2d 883 (Ala. 1996) (Hooper, C.J., dissenting); and Ex parte Jones, 686 So.2d 1166 (Ala.1996)(Maddox, J., dissenting), Thomson 5 noted that "the circuits have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Id. at 779 (emphasis in original). It then distinguished those cases, with the following explanation:
"As the district court pointed out, however, `[t]he situation here is inverse: [defendant-appellee Evans & Sutherland Computer Corporation (`E & S')], as signatory, seeks to compel Thomson, a non-signatory.' While E & S suggests that this is a non-distinction, the nature of arbitration makes it important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so.... In the line of cases discussed above, the courts held that the parties were estopped from avoiding arbitration because they had entered into written arbitration agreements, albeit with the affiliates of those parties asserting the arbitration and not the parties themselves. Thomson, however, cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists."
Id. at 779 (emphasis added).
Sandra Dickinson, like Thomson, never agreed to arbitrate anything. Yet Myers, as E & S sought unsuccessfully to do in Thomson, seeks to compel her to arbitrate, and it seeks to compel her simply on the ground that Myers and David Dickinson had agreed to arbitrate. That is not the law of contracts in this state.
The mere fact that the Nissan was apparently to be owned jointly by David and Sandra Dickinson is not dispositive. In Peterson v. David "Spud" Bishop Contractor, Inc., 547 So.2d 492 (Ala.1989), for example, we held that a wife, who was not a signatory to a contract for the renovation of a home owned jointly with her husband, was not obligated to pay for renovations done pursuant to the contract her husband signed. Id. at 493. We explained: "If we held otherwise, then a husband or wife would rarely be able to enter a contract of this nature with a third party *990 without the spouse's being deemed to have ratified the contract." Id.
For these reasons, we grant the petition to the extent the trial court's order compels arbitration of Sandra Dickinson's claims. Because she was not a signatory to a contract containing an arbitration clause, she cannot be compelled to arbitrate. Otherwise, the petition is denied.
PETITION GRANTED IN PART AND DENIED IN PART.
ALMON, SHORES, and KENNEDY, JJ., concur.
BUTTS, J., concurs in the result.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., concur in part and dissent in part.
MADDOX, Justice (concurring in part and dissenting in part.)
I concur with the portion of the main opinion that affirms the trial court's order compelling David Dickinson to submit his claims to arbitration; however, I must respectfully dissent from the main opinion's conclusion that Sandra Dickinson's claims are not subject to arbitration.
The undisputed facts are that both David and Sandra Dickinson were present at the execution of the Retail Buyer's Order;[1] that David voluntarily signed the order; and that Sandra observed the signing and did not object to the terms of the contract, in which she was listed as a "co-buyer." The plaintiffs signed various other documents on the day of the purchase.[2] The documents were signed by David, or Sandra, or both. Chris Myers argues that the Dickinsons sought joint ownership of one automobile through one transaction, which was witnessed and assented to by both parties.
The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., provides, in pertinent part:
"A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
9 U.S.C. § 2. Under 9 U.S.C. § 3, a party may seek a stay of proceedings pending arbitration, but in order to do so, must show (1) that a valid written arbitration agreement exists; (2) that the issues in the action are referable to arbitration under the agreement; and (3) that the party is not in default in seeking arbitration.[3] Under the provisions of § 2 of the FAA, a party seeking arbitration must show that the agreement in question involves interstate commerce. Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).
The United States Supreme Court recognizes a strong federal policy favoring arbitration and recognizes that the provisions of the FAA preempt any state substantive or procedural policies to the contrary. See Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 22, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983). The Supreme Court has stated that the effect of the FAA "is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Id., 460 U.S. at 24, 103 S.Ct. at 941. Under this policy and under federal caselaw, *991 one does not have to be a signatory to a contract to be bound by the provisions of an arbitration clause. Several federal courts have addressed this issue and have held, based upon the theory of estoppel, otherwise known as the "close relationship test," that "[a] signatory was bound to arbitrate with a nonsignatory at the nonsignatory's insistence because of `the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract ... and [the fact that] the claims were `intimately founded in and intertwined with the underlying contract obligations.'" Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir.1995); see also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir.1993), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994); McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir.1984); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir.1988).[4]
Sandra Dickinson, the nonsignatory, is suing for damages, based on the very contract in which the arbitration agreement is found. Can she pick and chose which parts she affirms and which she disavows? Stated differently, can she recover damages for an alleged breach of the contract and disavow the arbitration agreement that forms a part of the contract? I think not.
The facts of this case are similar to those of Ex parte Gray, 686 So.2d 250 (Ala.1996), where this Court required the plaintiff to arbitrate claims against an automobile dealer's salesman even though the salesman had not signed the Retail Buyer's Order. Also, the scope of the Dickinsons' arbitration clause is the same as that in Gray. Sandra Dickinson's acting jointly with her husband to purchase the automobile, her signing several documents individually during its purchase, and her presence and lack of objection during the signing of the Retail Buyer's Order, which contained her name as a co-buyer, all reflect an intention on the part of Sandra Dickinson to be bound by the agreement, even though she did not sign it.
My opinion, based upon the facts in this case, is that under Alabama and federal law, Sandra Dickinson's relationship to the parties is sufficiently close, and her claims so "intimately founded in and intertwined with the underlying contract obligations," as to make her subject to the arbitration clause. Thomson-CSF, S.A., supra. See Ex parte Stripling, 694 So.2d 1281 (Ala.1997) (noting that there are exceptions to the general rule that a nonsignatory cannot be bound by an arbitration agreement or compel arbitration); Prudential Securities, Inc. v. Micro-Fab, Inc., 689 So.2d 829 (Ala.1997) (recognizing and applying the "close relationship" test, Sunkist, supra); Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997) (holding that Palm Harbor had waived its right to compel arbitration but not holding that, absent a waiver, Palm Harbor, a nonsignatory, did not have the right to compel arbitration); Ex parte Gray, supra, 686 So.2d at 251 (holding that an agent, even though a nonsignatory, was entitled to compel arbitration, based upon the principle that "[a] party should not be able to avoid an arbitration agreement merely by suing an employee of a principal"); Ex parte Martin, [Ms. 1951420, November 8, 1996] 703 So.2d 883 (Ala.1996) (holding that the arbitration clause was not broad enough to allow Palm Harbor, a nonsignatory, to compel arbitration); Ex parte Jones, 686 So.2d 1166 (Ala.1996) (holding that one must be a signatory to a contract to compel arbitration); Ex parte Gates, 675 So.2d 371 (Ala. 1996) (holding that a nonsignatory could compel arbitration where the arbitration clause was sufficiently broad to encompass its claim); Ex parte Stallings & Sons, Inc., 670 So.2d 861 (Ala.1995) (holding that a party could not compel arbitration when the contract did not contain an arbitration agreement and specifically required written consent to arbitrate).
Based on the foregoing, I dissent from that portion of the opinion directing the trial court to vacate its order compelling Sandra Dickinson to arbitrate her claims.
HOOPER, C.J., and HOUSTON and SEE, JJ., concur.

*992 On Application for Rehearing

COOK, Justice.
APPLICATION OVERRULED.
ALMON, SHORES, KENNEDY, and BUTTS, JJ., concur.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., dissent.
MADDOX, Justice (dissenting).
Chris Myers Pontiac-GMC, Inc., admittedly filed its application for rehearing in reliance upon Boyd v. Homes of Legend, Inc., 981 F.Supp. 1423 (M.D. Ala.1997), in which the plaintiffs claimed that they were not bound by the provisions of an arbitration agreement because they had not signed the agreement. Chief Judge Myron Thompson, in an accurate and very well-reasoned interpretation of the Federal Arbitration Act as it relates to nonsignatories of an arbitration agreement, held that a person who claims benefits under a contract that contains an arbitration clause, as Sandra Dickinson does in this case, can be compelled to arbitrate even though that person did not actually sign the arbitration agreement.
The holding in Boyd is consistent with the federal cases holding that a nonsignatory to a contract can be compelled to arbitrate any claim that is "intimately founded in and intertwined with the underlying contract obligations." Thomson-CFS, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995). As I stated in my special writing on original deliverance, "Sandra Dickinson, the nonsignatory, is suing for damages, based on the very contract in which the arbitration agreement is found." 711 So.2d at 991 (emphasis original).
HOOPER, C.J., and HOUSTON, J., concur.
NOTES
[1] On that order the following names and designations appear at the top: "David R. Dickinson, Buyer" and "Sandra L. Dickinson, Co-Buyer."
[2] These documents include: "Buyer's Order," "Financing Contract," "Powers of Attorney," and "Odometer Disclosure Statement."
[3] The FAA provides, at 9 U.S.C. § 3: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." See Complaint of Hornbeck Offshore (1984) Corp., 981 F.2d 752, 754 (5th Cir. 1993).
[4] See Ex parte Jones, 686 So.2d 1166 (Ala.1996) (Maddox, J., dissenting).