# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-00902-SCT

*BARRY DOLEAC, THE DOLEAC COMPANY AND*
*THE DOLEAC BUILDING, LLC*

*v.*

*REAL ESTATE PROFESSIONALS, LLC*

## <u>ON MOTION FOR REHEARING</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 03/22/2004 |
| TRIAL JUDGE: | HON. SEBE DALE, JR. |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | RAY T. PRICE |
| ATTORNEYS FOR APPELLEE: | RICHARD ANTHONY FILCE |
| | ERIK M. LOWREY |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND REMANDED - 09/15/2005 |
| MOTION FOR REHEARING FILED: | 06/21/2005 |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is denied. The prior opinion is withdrawn, and this opinion is substituted therefor.

¶2.     Real Estate Professionals, LLC ("REP") sued Barry Doleac, The Doleac Company and The Doleac Building, LLC for breach of their Independent Contractor Agreement, tortious interference with business relations, breach of their Asset Purchase Agreement, trespass to chattels, conversion, and for punitive damages. REP also asked for an accounting, declaratory judgment and an injunction. Before trial, the Chancery Court of Forrest County granted a

temporary restraining order, permitting REP to remain in possession of the leased premises. Doleac's motion to dismiss the complaint and compel arbitration was denied by the chancellor. The chancellor found for REP, and Doleac now appeals to this Court. We hold that the chancery court erred in denying the motion to compel arbitration. Therefore, we reverse and remand with directions to submit all disputes to binding arbitration.

## FACTS AND PROCEDURAL HISTORY

¶3. Barry Doleac is the principal shareholder in Doleac Company and Doleac Building, LLC. The Doleac Company is owned 95% by Barry, president, who was also a licensed Mississippi real estate broker, and 5% is owned by his wife Carolyn. REP is a limited liability company organized and doing business as a real estate agency in Hattiesburg, Mississippi. The case sub judice is a suit for various claimed torts arising from the performance of three contracts which were signed to effectuate the sale of a real estate business.

¶4. The Doleac Company, Doleac Building and Barry Doleac executed three agreements with REP on December 31, 1999. Those three agreements are as follows: (1) an Asset Purchase Agreement (hereinafter "APA") for REP to buy The Doleac Company; (2) a Lease Agreement (hereinafter "LA") by which REP was to rent office space from The Doleac Building; and (3) an Independent Contractor Agreement (hereinafter "ICA") for Barry Doleac to work for REP for a period of five years.

¶5. The APA provided for the purchase by REP of certain business assets of The Doleac Company at a purchase price of $500,000, payable $125,000 at closing with balance evidenced by promissory note payable in monthly installments over a five-year period. The monthly installments were contingent upon Barry, agents currently associated with Barry and any other

2

agents recruited by Barry producing a minimum of $1,100,000 gross commission income yearly. The contract references a security agreement in REP's "present and future listing agreements and all personal property owned or acquired" that was to be attached to the APA but that security agreement was never attached. In conjunction with this, a UCC-1 financing statement was filed and reflects that it applied to REP's "listing agreements and sales contracts."

¶6. The APA stated that Barry would enter into an employment contract with REP, the terms of which were incorporated into and made part of the APA. This ICA provided that Barry would work for REP for a term of five years beginning on January 1, 2000, and continuing through December 31, 2004. The compensation to Barry was on a commission basis, outlined with specificity in the agreement. This agreement states that it is "the entire agreement between undersigned parties and can only be amended in writing and signed by both parties." The agreement does not make any provision for termination except by completion of the stated term.

¶7. Also incorporated into and made apart of the APA was a lease of certain property. This LA leased "suites 1, 4, 5, and part of suite 3" at a stated location to be used primarily for offices. The rental on this certain property was $7,500 per month to be paid the first of each month and a penalty of 4% to be added if payment is not received within ten days of the due date. This agreement provided that if there is a default by Lessee, Lessor will provide written notice and if such default is not cured within 10 days then "Lessor may re-take the same as if this lease had not been made."

¶8.     Almost immediately REP started becoming delinquent in making the payments under the LA and the APA.  The Doleac Company and Building called every month to inform REP that payment was late.  When the late payment was brought to the attention of REP, the sales manager would send a check which included the payment plus the late fee.  This sales manager left REP and after that Doleac Company had problems getting payment.  In July and August 2002, REP did not make the payments again and ignored the repeated inquiries about the late payments.   On behalf of Doleac Company and Doleac Building, Barry,  took the three agreements to his attorney in order to determine a course of action.  Barry Doleac, on advice of the attorney, changed the locks on the building which REP rented, as authorized and agreed to in the LA.  Barry said that he changed the locks on the building on Labor Day when the office was closed so that business was minimally disrupted and in order to quickly work something out regarding the late payments.  There was also a security guard stationed at the door in order to regulate access to the building.

¶9.     The agents working for REP were eventually allowed into the building, and some of the agents were accompanied by the security guard.   Four agents testified that the lock-out concerned them because they did not know exactly what was happening.  One agent testified that the lock-out affected REP because rumors started spreading to other companies and their agents.  Furthermore, one agent lost two listings because of the rumors regarding the lock-out.

¶10.    The next day, the owners of REP, Barry Doleac, and Doleac's attorneys met.  At the meeting Doleac told REP the amount of money due under the LA and APA which was required to be paid in order for the building to be unlocked.  Doleac's position was that the lease was null and void since REP was three months late.  Furthermore, since REP was late on payments

4

under the APA and since this agreement included an acceleration clause, Doelac considered the entire amount on the note due. The parties agreed that REP would pay the back due rent on the lease and that the parties would renegotiate a new lease for one suite. Furthermore, the parties agreed that REP would pay $50,000 under the APA instead of the full amount that was owed. The total amount that REP was required to pay in order to get the building unlocked was $80,600, which included the $50,000 on the APA, the back due rent and the current rent, attorney's fees and the cost of changing the locks. REP borrowed the money and paid Doleac what was owed. The next day a new key was given to REP, and it was given access to the building.

¶11. Subsequently, disagreements arose between the parties, and the negotiations on the new agreements fell apart. Barry Doleac, on behalf of The Doleac Company, sent letters to various real estate closing attorneys stating that they had a security agreement in present and future listings. The purported security agreement mentioned in the APA was never attached as an exhibit to the agreement, and the financing statement did not mention future commissions or listings. The real estate attorneys, upon receiving these letters, paid all commissions to The Doleac Company instead of sending them to REP. On September 17, 2002, Barry asked for REP to release his broker's license as required by state law. REP complied with this request, and Barry had his license transferred to The Doleac Company which he re-opened for business.

¶12. On September 30, 2002, REP filed a complaint in the Chancery Court of Forrest County against Barry Doleac, The Doleac Company, and The Doleac Building. The complaint sought an accounting, declaratory judgment, injunctive relief, and damages for conversion and

5

trespass to chattels, tortious interference with business, breach of the APA and breach of the ICA. Injunctive relief was granted, in the form of a temporary retraining order, permitting REP to remain in possession of the leased premises through October. Barry, The Doleac Company and The Doleac Building filed a motion to dismiss the complaint and compel arbitration which was subsequently denied by the chancery court.

¶13. Following trial, the chancery court found that Barry Doleac breached the ICA when he withdrew his broker's license and reopened The Doleac Company. The Doleac Building was found to have committed a conversion of personal property and tortious interference with business by wrongfully locking REP out of the leased premises and awarded damages in the amount of $10,000. In addition, The Doleac Company was found to have committed a conversion when it used the locked premises to demand $50,000 payment from REP and damages were awarded in that amount. The Doleac Company was also found to have committed conversion by failing to refund $15,539.96, which REP had overpaid under the APA and damages were awarded in that amount. The chancery court also awarded punitive damages, jointly and severally against all three defendants, in the amount of $25,000 and attorney's fees in the amount of $17,500.

¶14. Barry Doleac, The Doleac Company and The Doleac Building now appeal to this Court raising the following issues:

1. The Chancellor erred in failing to grant defendants' motion to dismiss the complaint and compel arbitration.
2. The Chancellor erred in asserting subject matter jurisdiction over this case and in failing to grant defendants' motion to transfer to circuit court.
3. The Chancellor erred in granting plaintiff's claim for conversion against Doleac Building, LLC and Doleac Company.

6

4. The Chancellor erred in finding that Barry Doleac and Doleac Company were liable for breach of the ICA and APA.

5. The Chancellor erred in awarding punitive damages and attorney's fees against all three defendants.

6. The Chancellor erred in finding Barry Doleac personally liable for acts done as an employee of Doleac Company and Doleac Building, LLC.

The issue regarding whether the chancellor erred in failing to grant defendants' motion to dismiss the complaint and compel arbitration is dispositive of this case. Therefore, we will only discuss the first issue raised by the defendants.

## DISCUSSION

### 1. Did the Chancery Court Err in Denying Defendants' Motion to Compel Arbitration?

¶15. Barry Doleac, The Doleac Company and The Doleac Building assert that the chancery court erred in denying the motion to compel arbitration because the dispute arises out of contracts which contain an arbitration clause. REP alleges that the arbitration clause is contained in only one of the contracts and the dispute does not arise out of this one contract. Thus, it maintains that these claims are outside the scope of the arbitration clause.

¶16. This Court conducts de novo review on both motions to dismiss and motions to compel arbitration. *Sullivan v. Mounger*, 882 So. 2d 129, 132 (Miss. 2004) (citing *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002). "In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement." *Id.* The second prong considers "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Id.*

7

*Did the parties enter into a valid arbitration agreement?*

¶17. There is a dispute as to whether the arbitration agreement is valid because the language of the arbitration agreement does not foreclose or preclude litigation. Specifically, the arbitration clause in the APA states that "[a]ny dispute under this agreement, *prior to litigation*, shall be submitted to arbitration in Hattiesburg, Mississippi, pursuant to the rules of the American Arbitration Association." (emphasis added). The chancery court denied the motion to compel arbitration because the court determined that the clause "is not either expressly nor impliedly binding arbitration, it is not the kind of arbitration that precludes litigation, but rather seeks to apply only as a precursor to litigation."

¶18. This type of arbitration clause presents and issue of first impression for this Court. However, several other states and circuits have dealt with arbitration clauses similar to the one in the case sub judice. The Superior Court of Connecticut views such arbitration clauses as condition precedents to judicial action. ***Hartford Acc. & Indem. Co. v. Ace Am. Reins. Co.***, 2003 WL 22245421, at * 5 (Conn. Super. Ct. 2003). They went further and held that "an agreement by the parties to arbitrate their disputes prior to seeking any judicial relief is binding and a court should not countenance the filing of a lawsuit if arbitration proceedings have not first been brought." ***Id.*** "Whether an agreement makes arbitration a condition precedent to an action in court depends on the language of the arbitration clause." ***Id.*** (quoting ***Multi-Service Contractors, Inc. v. Town of Vernon***, 181 Conn. 445, 447, 435 A.2d 983 (1980). Connecticut, when faced with such a clause, dismisses the action so that the parties can pursue the resolution of their dispute through arbitration. ***Id.*** at * 6. West Virginia also concludes that such clauses, if the language of the agreement makes arbitration a condition

8

precedent to any right of action, must be complied with before any judicial suit can be maintained. *Pettus v. Olga Coal Co.*, 72 S.E.2d 881, 887 (W. Va. 1952).

¶19.    In Colorado, the issue was whether such an arbitration clause called for a binding award or whether the award was non-binding when the parties subsequently filed a judicial suit. *Ringwelski v. Pederson*, 919 P.2d. 957 (Colo. Ct. App. 1996).  The court there concluded that such a clause requiring arbitration as a condition precedent called for a binding arbitration award and that "such award was a condition to any further 'legal action' either to modify, correct, or vacate the award pursuant to the Uniform Arbitration Act of 1975." *Id.* at 959.  The court reasoned that this interpretation of such a clause supports the public policy favoring the use of arbitration to resolve disputes. *Id.*  The Colorado court went further and stated that "our interpretation of the clause is also consistent with decisions of courts from other jurisdiction which have rejected claims that similar 'condition precedent' language evidenced an intent for non-binding arbitration." *Id.*  In determining that its interpretation was consistent with other courts, the court cited *Kelleher v. Cersosimo*, 320 N.E.2d 840 (Mass. App. Ct. 1974), in which the Appeals Court of Massachusetts construed an arbitration clause similar to the one in their case.  The Massachusetts court, in rejecting the argument that the arbitration award was non-binding, noted that the "condition precedent" language was a historical carryover from a time when arbitration agreements were viewed with disfavor as an attempt to oust courts of jurisdiction. *Kelleher*, 320 N.E.2d at 841.  The Colorado court in *Ringwelski* held that the agreement provided for binding arbitration and that the trial court was precluded from addressing the merits of plaintiffs' complaint.  919 P.2d at 959.

¶20. Similarly, the Fourth Circuit dealt with the issue of whether the parties agreed to arbitration as a binding process, one that would bar litigation, or whether the agreement to arbitrate was simply a dispute settlement process that was a condition precedent to litigation. *Rainwater v. Nat'l Home Ins. Co.*, 944 F.2d 190 (4th Cir. 1991). It stated that this determination was critical because the Federal Arbitration Act provides that a court has jurisdiction to confirm an award only if the parties have agreed that the award is final. *Id.* at 192. That court concluded that reference to the American Arbitration Association rules is enough to make arbitration binding. *Id.* at 193. In coming to this conclusion, the Fourth Circuit cited *Commonwealth Edison Co. v. Gulf Oil Corp.,* 541 F.2d 1263, 1272-73 (7th Cir. 1976) and *Varley v. Tarrytown Assocs., Inc.*, 477 F.2d 208, 210 (2d Cir. 1973), which also held that if the clause makes reference to the American Arbitration Association rules then the arbitration is binding. 944 F.2d at 193. The Fourth Circuit held that the arbitration was final and binding. *Id.* at 194.

¶21. Likewise, the Fifth Circuit has also dealt with whether such an arbitration clause calls for binding arbitration. In *McKee v. Home Buyers Warranty Corp.*, 45 F.3d 981, 983 (5th Cir. 1995), the Fifth Circuit, citing the above mentioned circuits, also held that arbitration is biding where the rules under which the arbitration is conducted call for binding arbitration. In *McKee*, the court pointed out that it was undisputed that the agreement provided that the American Arbitration Association rules would govern if the dispute was submitted to arbitration. *Id.* at 983. The Fifth Circuit agreed with the Fourth Circuit's treatment of this issue in *Rainwater*. *Id.* at 984. In citing *Rainwater*, the Fifth Circuit concluded that such an arbitration clause does

10

"not undermine the binding nature of arbitration, but instead applies to the confirmation process permitted by 9 U.S.C. § 9." *Id.* The Fifth Circuit held that "because the Kilpatricks submitted the dispute to arbitration under AAA rules that required binding arbitration unless the warranty provided for non-binding arbitration, and the warranty did not provide for non-binding arbitration, the district court was correct in determining that the arbitration was binding." *Id.*

¶22. Here, the arbitration clause specifically makes arbitration a condition precedent to any judicial action. Thus, this Court finds that the clause is valid and that no judicial action can be maintained until arbitration has been pursued. Furthermore, the arbitration clause in question also states that the dispute shall be submitted to arbitration "pursuant to the rules of the American Arbitration Association." Pursuant to the above circuits, including the Fifth Circuit, this Court holds that arbitration is binding and final since the arbitration clause in question references the American Arbitration Association rules. Therefore, the arbitration clause in question is valid and binding on the parties.

*Is the parties' dispute within the scope of the arbitration agreement?*

¶23. The ICA and the LA do not contain an arbitration clause but the APA does contain an arbitration clause. REP argues that because the LA and ICA do not contain an arbitration clause, any claims under those agreements are not subject to arbitration.

¶24. In *Personal Security & Safety Systems, Inc. v. Motorola, Inc.*, 297 F.3d 388, 390-91 (5th Cir. 2002), PSSI and Motorala executed three agreements in connection with their investment: a Stock Purchase Agreement, a Shareholders Agreement and a Product Development and License Agreement. The Product Development and License Agreement

11

contained an arbitration clause, and the court held that "the licensing agreement's arbitration provision governs claims arising out of the stock purchase agreement because the agreement were executed together as part of the same overall transaction and therefore are properly construed together." *Id.* at 390. Furthermore, in *Neal v. Hardee's Food Systems, Inc.*, 918 F.2d 34, 36 (5th Cir. 1990), Hardee's and Neal entered into a Purchase Agreement which expressly provided that Neal would contemporaneously enter into License Agreements with Hardee's. The License Agreements contained an arbitration clause, and Neal filed a complaint against Hardee's for claims arising under the Purchase Agreement, which did not contain an arbitration clause. *Id.* The court, however, held that "[a]lthough the parties used multiple agreements to delineate their relationship, each agreement was dependant upon the entire transaction. . . . The individual agreements were integral and interrelated parts of the one deal." *Id.*

¶25. Likewise, in *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 723 (Miss. 2002), there were two contracts: a Retail Buyer's Order and a Purchaser's Agreement Concerning Trade In. The Retail Buyer's Order contained an arbitration clause, and Russell argued that since his claims concerned the other agreement, which did not have an arbitration clause, any claims that involved the trade in agreement were not subject to arbitration. *Id.* However, this Court noted that the Retail Buyer's Order specifically stated: "The attached Purchaser's Agreement Concerning Trade In hereby is incorporated into this contract." *Id.* This Court affirmed the trial court's referral of the case to arbitration. *Id.* This Court again held in *Sullivan v. Mounger*, 882 So. 2d 129, 134-35 (Miss. 2004), that all of the individual

agreements entered into were integral and interrelated parts of a single, global settlement transaction and as such all three documents were construed together.

¶26. Here, the APA specifically incorporates the LA and the ICA. The APA states that "Purchaser will enter into an employment contract with the Sellers principal shareholder, Barry C. Doleac, the terms of which shall be incorporated herein and made a part of this agreement." Furthermore, the APA also stated that "Purchaser agrees to lease from Seller that certain property and improvements thereon located at 6606 U.S. Highway 98 West, Hattiesburg, MS 39402, pursuant to that LA, the terms of which are incorporated herein and made a part of this agreement." The APA went even further and stated that "[t]his agreement and the other agreements contemplated hereby set forth the entire understanding of the parties. . . ." As was the case in *Neal*, *Russell*, and *Sullivan*, there is no question in the case sub judice that all the individual documents were integral and interrelated parts of a single transaction. The Court in *Neal* stated that "under general principles of contract law, separate agreements executed contemporaneously by the *same parties*, for the same purposes, and as part of the same transaction, are to be construed together." *Neal*, 918 F.2d at 37. Since the three separate agreements were executed at the same time, by the same parties, as part of the same transaction, they are to be construed as one instrument. Furthermore, as was the case in *Russell*, the APA specifically incorporates the other two agreements. Therefore, the claims under all three agreements are subject to the arbitration clause contained in the APA.

¶27. REP also argues that the arbitration clause in question is narrow and does not include tort claims. However, when the scope of an arbitration clause is in question, the court should construe the clause in favor of arbitration because the "FAA establishes that, as a matter of

13

federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525, 527-28 (5th Cir. 1983) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 941-42, 74 L. Ed. 2d 765 (1983)). REP's tort claims relate to the LA and whether Doleac had the right to lock REP out of the building and demand money under the APA in order to unlock the building. The arbitration clause specifically states "any dispute under this agreement." Since the tort claims arise under the agreements and all three agreements are subject to the arbitration clause, all claims brought by REP are to be referred to arbitration pursuant to the arbitration clause.

*Waiver*

¶28. REP argues and the chancery court found that Barry Doleac, The Doleac Company and The Doleac Building waived their right to arbitrate. The chancery court found that "the Defendant, or one or more of them, have resorted to 'self-help' to resolve one or more issues which the actor(s) believed to have created a 'dispute' between them, then such actor(s) have failed to resort to the arbitration clause of which they now want to avail themselves." The chancery court concluded that since Barry, The Doleac Company and The Doleac Building used self-help to lock REP out of the building instead of resorting to arbitration, they waived their right to arbitrate.

14

¶29. However, a "[w]aiver of arbitration is not a favored finding, and there is a presumption against it." ***Russell v. Performance Toyota, Inc.***, 826 So. 2d at 724 (quoting ***Miller Brewing Co. v. Fort Worth Distrib. Co.***, 781 F.2d 494, 497 (5th Cir. 1986)). "A party alleging waiver of arbitration must carry a heavy burden." ***Subway Equip. Leasing Corp. v. Forte***, 169 F.3d 324, 326 (5th Cir. 1999). In ***Russell***, Toyota took possession of the truck in question without instituting legal proceedings against Russell. 826 So. 2d at 724.

¶30. Here, the APA referenced the LA and clearly stated that "the purchaser agrees to lease from Seller that certain property . . . pursuant to that lease agreement, the terms of which are incorporated herein and made part of this agreement[.]" The APA also clearly identifies The Doleac Company (c/o Barry C. Doleac, President) as the Seller and Real Estate Professionals as the Buyer. Further, the language of the LA as referenced in the APA provided that if there is a default by Lessee, "Lessor may re-take the same as if this lease had not been made." The LA clearly identifies The Doleac Building as Lessor and Real Estate Professionals as Lessee. Therefore, the LA and APA specifically afforded Doleac Building, Doleac Company and Barry Doleac (as President of Doleac Company) the right to use self-help when REP defaulted.

¶31. As this Court noted in ***Russell***, other jurisdictions addressing this issue have held that taking possession of the collateral or other similar actions do not waive a party's right to arbitration. *See*, *e.g.*, ***Southwest Indus. Imp. & Exp., Inc. v. Wilmod Co.***, 524 F.2d 468, 470 (5th Cir. 1975) (seller-mover's participation in settlement discussions and self-help measure of reselling goods in dispute did not amount to waiver of contractual right to arbitrate); ***Eagle***

*Telecom, Inc. v. Billing Concepts Sys., Inc.*, 1999 WL 570860 *1 (E.D. Pa. 1999) (unilateral discontinuance of services under an agreement does not result in waiver of right to arbitration); *Ex parte Dickinson*, 711 So. 2d 984, 988 (Ala. 1998) (Dickinson's claim that the dealership should have allowed the repossessed vehicle to remain in his possession pending arbitration "confuses self-help with 'judicial process.'" "[S]elf-help is not 'judicial process,' and we decline to extend the rule to encompass self-help."); *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 345 (Ky. Ct. App. 2001) (Lender did not waive its right to arbitration by pursuing repossession of mobile home because repossession was not for purpose of gaining tactical advantage with respect to court proceedings.) Therefore, The Doleac Company and The Doleac Building's actions of self-help did not waive the contractual right to arbitrate.

## CONCLUSION

¶32. The arbitration clause is valid and binding on all claims asserted by REP, and the actions of self-help were not a waiver of the right to arbitrate. We hold that the chancery court erred in denying the motion to compel arbitration. Therefore, we reverse both the order denying the motion to compel arbitration and the chancellor's judgment and remand this case to the chancery court with directions to submit all disputes to binding arbitration.

¶33. **REVERSED AND REMANDED.**

**WALLER AND COBB, P.JJ., EASLEY, CARLSON AND DICKINSON, JJ., CONCUR. DIAZ, GRAVES AND RANDOLPH, JJ., NOT PARTICIPATING**.