# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00365-COA

**CNRS&Z INC., TOGO MOTORS LLC AND SUNSHINE AUTOPLEX LLC**  APPELLANTS

**v.**

**BRIDGECREST ACCEPTANCE CORPORATION AND DRIVETIME CAR SALES COMPANY LLC**  APPELLEES

DATE OF JUDGMENT:             03/25/2024
TRIAL JUDGE:                  HON. ROBERT B. HELFRICH
COURT FROM WHICH APPEALED:    FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANTS:      R. LANE DOSSETT
ATTORNEY FOR APPELLEES:       D. STERLING KIDD
NATURE OF THE CASE:           CIVIL - CONTRACT
DISPOSITION:                  AFFIRMED - 11/25/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., EMFINGER AND WEDDLE, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.    Used car dealers CNRS&Z Inc. (CNRS&Z), ToGo Motors LLC (ToGo), and Sunshine Autoplex LLC (Sunshine) (also referred to as Plaintiffs or Appellants) sued Bridgecrest Acceptance Corporation (Bridgecrest) and DriveTime Car Sales Company LLC (DriveTime) (also referred to as Defendants or Appellees) in the Forrest County Circuit Court for funds collected by Defendants that Plaintiffs believed were owed to them. Defendants filed a motion to compel arbitration, which the trial court granted in part and denied in part. Plaintiffs appealed, but Defendants did not cross-appeal. We find no error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.     First, it is necessary to understand the parties' businesses and their relationships before analyzing the underlying arbitration issues in this case.  Plaintiffs/Appellants were in the business of selling used vehicles to the general public in the Hattiesburg, Mississippi area.  To complete sales, they provided financing for their purchasers through GFC Lending LLC, which the complaint stated was "an inactive Arizona limited liability company that conducted business under the trade name of 'GO Financial.'"  The complaint stated that GFC Lending announced through its president that "'GO Financial' was going to stop accepting new loans" because its parent company, DriveTime, decided to "relocate capital to its other core businesses."  Even so, "GO Financial" would continue to service and collect on its existing loans.  The complaint also stated that GFC Lending released marketing materials to the public stating that "[o]n May 2, the new face of GO Financial servicing will be Bridgecrest."  The complaint noted that the material was released by DriveTime.[1]

¶3.     The complaint described Bridgecrest "as an Arizona corporation authorized to do business in Mississippi," and Plaintiffs alleged that Bridgecrest and DriveTime are "affiliated"[2] and are the "successor entities of the former GFC Lending" that conducted

---

[1]  The complaint stated that the announcement "consistently noted '[w]hile we may be changing our name, we will still be providing the same great service,'" and after the name change, the customers' usernames and passwords would remain the same.

[2]  Defendants/Appellees dispute this contention, however, claiming that DriveTime is not a proper party to this suit but that the matter will be resolved in arbitration.  In their appellees' brief, they claim DriveTime and Bridgecrest "are separate entities that operate entirely different types of businesses.  DriveTime does not hold retail installment

2

business as GO Financial. The complaint asserted that Bridgecrest, DriveTime, and GFC Lending "have operated as alter egos of one another, sharing resources, websites, employees, and assets. Plaintiffs have experienced frustration of contractual expectations, such that the corporate veils of these entities should be pierced."

¶4. GFC Lending entered into separate contractual agreements, called "GO-Dealer Agreements" (Dealer Agreements) with the three plaintiff dealerships, CNRS&Z, ToGo, and Sunshine, which allowed the dealerships to provide vehicle financing to their customers. CNRS&Z's Dealer Agreement was executed in September 2013 by Frances Cullop, as vice president of CNRS&Z; however, it was not executed by a representative of GFC Lending. ToGo's and Sunshine's Dealer Agreements were both executed in January 2015 by Clayton Hinton and Cullop, respectively, as "managing members."[3] Defendants, however, could only provide a copy of the entire Dealer Agreement with CNRS&Z.[4] Defendants admitted

contracts—it is an originating dealer" like Plaintiffs. However, because Plaintiffs have "alleged DriveTime is an assignee," the Defendants/Appellees contend that DriveTime is entitled to enforce the arbitration provision on its terms."

[3] While Cullop signed both CNRS&Z's and Sunshine's agreements, as explained in Plaintiffs' supplemental memorandum in opposition to arbitration (filed in February 2024), Cullop owned Sunshine but did not have an interest in the other two plaintiffs.

[4] The affidavits of ToGo and Sunshine seem to imply that "Exhibit B," which was pages fifteen and sixteen of the Dealer Agreements, was the entire agreement. Cullop, on behalf of Sunshine, swears in her affidavit:

I have no personal recollection of ever signing any agreement with an arbitration provision with GFC Lending, LLC or any Defendant in this case. The only agreement I recall entering into on behalf of Sunshine Autoplex was with GFC Lending, LLC, and it was titled "Contract Pool Terms," in a similar

3

they only retained the signature pages of ToGo's and Sunshine's Dealer Agreements,[5] but Defendants maintained that the agreements were identical to CNRS&Z's Dealer Agreement, which contained an arbitration provision. In furtherance of this claim, Defendants later provided a blank "master" Dealer Agreement containing an arbitration provision that had the same version numbers ("v 1.14-July 2014") as the ones on the signature pages of ToGo's and Sunshine's Dealer Agreements.

¶5.    The Dealer Agreement between CNRS&Z and GFC Lending explained the financing program between the dealership and GFC Lending.[6]  Each vehicle the dealership sold for which GFC Lending provided financing was called a "contract." These contracts were grouped together into a "contract pool," typically consisting of eighty contracts. The Dealer Agreement provided that once a pool was filled, GFC Lending (or "GO") would compensate Plaintiffs with certain payments designated as "pool acquisition costs," "rewards payments," and, at issue here, "backend payments." The backend payments were calculated by taking eighty percent of pool credits and then subtracting pool debits (expenses associated with the

---

format to that identified as pages 15 and 16 of Defendants' Motion Exhibit "A."

Hinton, for ToGo, makes a similar statement in his affidavit.

[5] At the hearing on the motion to compel arbitration, Defendants' counsel explained that "both parties apparently simply kept the signature pages, and it's not a surprise because we have what is a master sales agreement that has standard terms that everybody already knows."

[6] In the Dealer Agreement, GFC Lending is also referred to as "GO."

4

contract pools) and total pool advances (the total cost of the contract pool). The Dealer Agreement provided that "[b]ackend [p]ayments are based on the separate performance of each [c]ontract [p]ool." The Dealer Agreement also provided that "[s]olely for the purpose of calculating [p]ool [p]erformance," GFC Lending (or "GO") would maintain an accounting of all payments, credits, and expenses associated with the contract pool. No backend payments would be payable after the "Pool Completion Date."

¶6.     Plaintiffs claimed that over the course of doing business with GFC Lending, they completed at least twenty-five pools, selling approximately 2,500 vehicles, at which point they waited for the pool financing to collect and mature so that backend payments would be paid. When GFC Lending ceased to exist, Plaintiffs were notified that the loans were being serviced by Bridgecrest and DriveTime. At this time, Plaintiffs stated that they had "hundreds of thousands of dollars in positive pools, which indicated eventual positive returns of more than a million dollars to one or more" of the dealerships once the pools matured and were paid out over the amortization period.

¶7.     However, when Plaintiffs asked about the status of the collection of the pools or when backend payments would begin, Plaintiffs claim a Bridgecrest representative told them that no backend payments were expected because all the pools were negative in collections. In February 2021, when Plaintiffs, through counsel, requested from Bridgecrest and DriveTime an itemized report of each pool's performance, they were informed via email that Defendants "no longer have the resources to do that."

¶8. In response, in September 2021, CNRS&Z, ToGo, and Sunshine filed suit against Bridgecrest and DriveTime for several claims, including negligence, breach of contract, intentional breach of contract, promissory and equitable estoppel, conversion, accounting, and fraud. Plaintiffs alleged that "Bridgecrest and DriveTime have assumed, by some unknown legal or illegal means, the equitable responsibility of the original agreements with GFC Lending to collect the subject loans, account for the transactions, and pay Plaintiffs their Backend Payments." No exhibits, such as contracts, were attached to the complaint. Plaintiffs sought a jury award for the sums collected by Defendants that Plaintiffs believed were owed to them. In November 2021, Defendants answered, arguing the claims were subject to binding arbitration.

¶9. In June 2022, Defendants filed a motion to compel arbitration or, alternatively, to dismiss the complaint. Defendants attached the complete, seventeen-page Dealer Agreement between GFC Lending and CNRS&Z, which included a mandatory arbitration provision,[7] as well as a venue clause designating the venue in Arizona. This agreement, however, was not signed at the end by an authorized representative of GFC Lending or initialed on each page, as CNRS&Z had done. Defendants also attached the two Dealer Agreements between GFC Lending and ToGo, as well as Sunshine. As mentioned earlier, though, those two agreements provided by Defendants only contained the executed first and the last two pages,

---

[7] The arbitration provision provided that any arbitration would be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1–6.

6

as Defendants had not retained the entire contracts. Neither of these partial documents, which appeared from the page numbering to be a total of sixteen pages, contained an arbitration provision. Both Dealer Agreements indicated they were a version from July 2014, while the CNRS&Z Dealer Agreement was a version from April 2013.

¶10. Plaintiffs responded to the motion to compel, claiming arbitration should be denied because they never entered into an arbitration agreement with Bridgecrest or DriveTime. Further, they argued the Dealer Agreements expressly prohibit assignment and third-party beneficiaries. Additionally, they claimed there was no evidence of an arbitration agreement with ToGo and Sunshine. Plaintiffs attached affidavits of the managing members of ToGo and Sunshine, i.e., Hinton and Cullop, respectively. Both individuals swore that they had no record or "personal recollection" of signing any agreement containing an arbitration provision with GFC Lending or any other Defendant; they only recalled entering into an agreement "with GFC Lending, titled 'Contract Pool Terms,' identified as pages 15 and 16," which are the last two pages of the Dealer Agreements (identified as "Exhibit B").[8]

---

[8] This exhibit states in part:

> This Exhibit B to GO-Dealer Agreement is made by GO and Dealer to state the terms applicable to the Contract Pool created by Dealer and GO *pursuant to the existing GO-Dealer Agreement.* This Exhibit B *is attached to and incorporated in the GO-Dealer Agreement.* . . . Dealer seeks to sell Contracts to GO to be grouped by GO into the Contract Pool identified above, *all pursuant to the GO-Dealer Agreement* . . . .

(Emphasis added).

Defendants replied, claiming that all three plaintiffs agreed to the arbitration provision in the Dealer Agreements. Further, they argued that Plaintiffs were estopped from suing under the Dealer Agreements while simultaneously disclaiming the arbitration agreement contained therein.

¶11.    In January 2023, a hearing was held on Defendants' motion to compel arbitration, after which the trial judge found the issue premature and ordered limited discovery on the relationship between GFC Lending and Defendants and whether there was an arbitration agreement that applied to Plaintiffs.

¶12.    In response to the trial judge's order, in February 2024, Defendants filed a supplemental memorandum of authorities to support their motion to compel arbitration, claiming discovery "further supported" their position. They claimed Plaintiffs' arbitration-related discovery focused on the contracts Defendants purchased from GFC Lending, and documents supporting their motion. Defendants responded to the discovery by producing a "Purchase and Sale Agreement" between GFC Lending and Plaintiffs,[9] its available attachments, and a blank, unsigned copy of the July 2014 version of GFC Lending's Dealer Agreement. This document contained an arbitration provision in section 10.10, as did CNRS&Z's April 2013 version. Defendants argued that this document defeated ToGo and

---

[9] The Purchase and Sale Agreement was provided to the trial court for in-camera review pending adjudication of Plaintiffs' motion to file the exhibit under seal or, alternatively, for permission to file it. Ultimately, the trial court denied Plaintiffs' request to file the agreement in the record for purposes of this appeal.

Sunshine's claim that their Dealer Agreements did not contain such a provision.

¶13.    Plaintiffs responded to Defendants' supplemental memorandum, claiming that the additional discovery "shed no new light," and Defendants still could not show there was a binding arbitration agreement between the parties. Plaintiffs maintained that the only *signed* Dealer Agreement provided by Defendants, which included an arbitration provision, was between CNRS&Z and GFC Lending—not ToGo and Sunshine or Bridgecrest and DriveTime. Plaintiffs also claimed that no third-party beneficiaries are involved and that no assignment had occurred.

¶14.    In February 2024, a post-discovery hearing was held. From the bench, the trial judge ruled the contractual claims Plaintiffs made were subject to the arbitration clause, but the remaining claims were not. On March 25, 2024, the trial court entered an order granting in part and denying in part Defendants' motion to compel arbitration. The order referred the contract-based claims to binding arbitration in Arizona. The court designated its order as a final judgment and immediately appealable.[10] The court determined that the requested transfer of venue for the contract claims was moot, denied the request to transfer venue for

_____

[10]    Even though the trial court did not expressly cite Rule 54(b) of the Mississippi Rules of Civil Procedure, which allows the trial court to enter a final judgment on fewer than all the claims or parties in an action, the order is appealable. The order cited language from the rule, specifically stating it deemed the order a final judgment because there was "no . . . reason for delay" in its entry. "In Mississippi, the only time an appeal of right is allowed from an otherwise interlocutory order is in the case of an appeal from an order either denying or granting arbitration." *Hinds County v. Perkins*, 64 So. 3d 982, 987 (¶17) (Miss. 2011) (citing *Sawyers v. Herrin-Gear Chevrolet Co.*, 26 So. 3d 1026, 1034 (¶19) (Miss. 2010)). Therefore, this Court has jurisdiction to review this appeal.

9

the tort claims, and stayed the action pending results of the arbitration. Plaintiffs appealed; Defendants did not cross-appeal.

## STANDARD OF REVIEW

¶15. We review an order compelling arbitration under a mixed standard—reviewing factual findings for an abuse of discretion and legal conclusions de novo. *Virgil v. Sw. Miss. Elec. Power Ass'n*, 296 So. 3d 53, 59 (¶11) (Miss. 2020) (quoting *Smith v. Express Check Advance of Miss. LLC*, 153 So. 3d 601, 605-06 (¶8) (Miss. 2014)).

## ANALYSIS

¶16. Appellants claim that the trial court improperly granted Defendants' motion for arbitration on their contract claims. First, Appellants argue there were no validly executed agreements between the parties that include an arbitration provision. Appellants contend that there was no binding Dealer Agreement between CNRS&Z and GFC Lending because that agreement was not executed by GFC Lending; there was no binding Dealer Agreement between GFC Lending and either ToGo or Sunshine because only three pages of that agreement were provided to the court, and those pages did not include an arbitration provision; and finally, there was no executed arbitration provision where Defendants Bridgecrest and/or DriveTime were parties. They further assert that Appellees have no right to arbitration because they are not third-party beneficiaries or assignees of the Dealer Agreements entered into by GFC Lending.

¶17. "In determining the validity of a motion to compel arbitration under the Federal

Arbitration Act, courts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement, and (2) whether the parties' dispute is within the scope of the arbitration agreement."[11] *E. Ford Inc. v. Taylor*, 826 So. 2d 709, 713 (¶9) (Miss. 2002). The Federal Arbitration Act states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. . . ." 9 U.S.C. § 2. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Taylor*, 826 So. 2d at 713 (¶11) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

## I.    Validity of the Arbitration Agreements

¶18.    The Mississippi Supreme Court has "consistently recognized the existence of 'a liberal federal policy favoring arbitration agreements.'" *EquiFirst Corp. v. Jackson*, 920 So. 2d 458, 461 (¶10) (Miss. 2006) (quoting *Terminix Int'l Inc. v. Rice*, 904 So. 2d 1051, 1054-55 (¶7) (Miss. 2004)). "The burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *Wellness Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292

---

[11]    Appellants do not contest that the contract dispute was within the scope of the arbitration provision.

(¶14) (Miss. 2015) (citing *Trinity Mission Health & Rehab. of Holly Springs v. Lawrence*, 19 So. 3d 647, 651-52 (¶14) (Miss. 2009)). To determine whether a valid arbitration agreement exists, the reviewing court applies the law of contracts. *Gregory Meridian Acquisition LLC v. McFarland*, 386 So. 3d 381, 386 (¶10) (Miss. Ct. App. 2023) (citing *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1158 (¶7) (Miss. 2010)). Mutual assent is one of several elements necessary to form a contract. *Id.* (quoting *Grenada Living Ctr. LLC v. Coleman*, 961 So. 2d 33, 37 (¶9) (Miss. 2007)). Here, Appellants argue mutual assent was lacking.

¶19. First, Appellants claim that Defendants cannot enforce the arbitration clause in CNRS&Z's Dealer Agreement because GFC Lending did not sign the agreement. In support of this argument, Plaintiffs cite *Huckaba v. Ref-Chem L.P.*, 892 F.3d 686 (5th Cir. 2018). In *Huckaba*, involving a workplace sexual harassment action, the United States Court of Appeals for the Fifth Circuit reversed the district court's grant of the employer's motion to compel arbitration and remanded. *Id.* at 691. While the employee had signed the arbitration agreement, the employer had not. *Id.* at 688. Applying Texas law, the Court of Appeals found that "[b]ecause the express language of the agreement at issue" required the arbitration agreement to be signed by both parties, it was necessary to reverse and deny arbitration, as it was undisputed that the employer did not sign it. *Id.* at 687. This case, however, is distinguishable, as no such express language in the Dealer Agreement requires it to be signed by both parties to be effective. The contractual language in *Huckaba*

12

provided:

> The organization referred to above ("Employer") and the Employee, whose signature is affixed hereto, ("Employee"), *mutually recognize* that there are many advantages to using mediation and arbitration to settle any and all legal disputes and claims, including, but not limited to, all those arising from or in the course of employment. . . . In consideration of these many benefits, *the mutual agreement of both parties to the binding arbitration provisions*, the continuation of the employment relationship and other consideration, the sufficiency of which is hereby acknowledged by Employee, *the parties hereto mutually agree that this document shall govern the resolution of all claims and disputes between them.*

> In addition, the agreement states that *"[b]y signing this agreement the parties are giving up any right they may have to sue each other"* and that the agreement *"may not be changed, except in writing and signed by all parties."*

*Huckaba*, 892 F.3d at 688 (emphasis added). The instant sixteen-page agreement had no separate signature line for the section 10.10 arbitration provision. In comparison, the first page of the Dealer Agreement merely read:

> In consideration of the representations, warranties and covenants of the parties stated in this GO-Dealer Agreement, including the Exhibits and other attached or referenced documents (collectively, this "Agreement"), GO and Dealer agree to participate in and comply with the GO Program described in this Agreement. *By its signature* below, each party acknowledges that it received, read, understands, approves of and agrees to each and every term and provision of this Agreement and expressly intends to enter into a binding and enforceable contract with the other party, effective as of the Agreement Date.

(Emphasis added). While the Dealer Agreement anticipates both parties would sign the document, the agreement does not provide that it is unenforceable if only one party executes it.

13

¶20.    Mississippi's arbitration statute provides in pertinent part: "All persons, except infants and persons of unsound mind, may, *by instrument of writing*, submit to the decision of one or more arbitrators any controversy which may be existing between them, which might be the subject of an action . . . ." Miss. Code Ann. § 11-15-1 (Rev. 2019) (emphasis added). Notably, although an arbitration agreement must be in writing, the statute does not provide that the writing must be signed. One general treatise explains:

> While a party typically manifests its assent to arbitrate a dispute by signing the contract containing the arbitration provision, most arbitration acts do not require that arbitration agreements be signed by the party to be charged although the arbitration agreement may impose such requirement by clearly and explicitly requir[ing] a signature before it becomes binding.[12]

6 C.J.S. *Arbitration* § 34 (updated May 2025).

¶21.    In *Brumm v. McDonald & Co. Securities Inc.*, 603 N.E.2d 1141 (Ohio Ct. App. 1992), the Ohio Court of Appeals held that although the Ohio Arbitration Act required arbitration agreements to be in writing, the Act did not require written arbitration agreements to be signed. *Id.* at 1145. Citing *Williston on Contracts*, the court noted "the great majority of jurisdictions nationwide which require written arbitration contracts do not require the signatures of the parties in order to enforce them." *Brumm*, 603 N.E.2d at 1145 (citing 16 Samuel Willison, A Treatise on the Law of Contracts § 1919A, at 163 (1976)). And, quoting *Fisser v. International Bank*, 282 F.2d 231, 233 (2d Cir. 1960), the court explained that a

---

[12] The case cited by Plaintiffs, *Huckaba*, contains a clause such as this one. The agreement between the instant parties, however, does not.

14

party's signature is not a prerequisite to enforcement of an arbitration agreement:

> It does not follow, however, that under the [Arbitration] Act an obligation to arbitrate attaches only to one who has *personally signed* the written arbitration provision. *For the Act contains no built-in Statute of Frauds provision but merely requires that the arbitration provision itself be in writing. Ordinary contract principles determine who is bound by such written provisions and of course parties can become contractually bound absent their signatures.* It is not surprising then to find a long series of decisions which recognize that *the variety of ways in which a party may become bound by a written arbitration provision is limited only by generally operative principles of contract law.*

*Id.* at 102-03 (emphasis added).[13]  Therefore, the validity of an arbitration provision is dependent on principles of contract law and not on signature alone.

¶22.    For example, Corpus Juris Secundum states, "An unsigned agreement is enforceable where the parties have acted pursuant to the terms of the contract that contained the arbitration clause."  6 C.J.S. *Arbitration* § 34.  In the instant case, both parties were performing on the Dealer Agreements.  In their complaint, Plaintiffs claimed that they had completed at least twenty-five pools, having sold approximately 2,500 vehicles.  They explained that once the pools matured, backend payments would be made.  As explained by counsel for Defendants at the hearing, Defendants advanced millions of dollars to finance Plaintiffs' sale of these vehicles in accordance with the Dealer Agreements.

¶23.    Lastly, the encyclopedia explains, "Even if it was not signed by the party seeking

---

[13]    *See, e.g.*, *Marino v. Dillard's Inc.*, 413 F.3d 530, 532 (5th Cir. 2005) (citing *Hurley v. Fox*, 520 So. 2d 467, 467 (La. Ct. App. 1988)) (Applying Louisiana law, the federal appeals court found that contract law did not require employee's written acceptance of an arbitration agreement with an employer, i.e. a signature.).

arbitration, an agreement to arbitrate may be enforced against the party who signed it." 6 C.J.S. *Arbitration* § 34. This concept is in accord with Mississippi statutory law. Mississippi's Statute of Frauds, Mississippi Code Annotated Section 15-3-1 (Rev. 2019), provides that to be enforceable, certain contracts "shall be in writing, and signed by the party to be charged therewith . . . ." Section 135 of the Second Restatement of Contracts also provides that "Where a memorandum of a contract within the Statute is signed by fewer than all parties to the contract and the Statute is not otherwise satisfied, the contract is enforceable against the signers but not against the others." Restatement (Second) of Contracts § 135 (1981). Here, CNRS&Z signed the Dealer Agreement and thus was bound by it. Although GFC Lending did not sign the CNRS&Z agreement, it was bound by other principles of contract law since both parties performed under the agreement, expressing their assent.

¶24. Second, Appellants argue that ToGo and Sunshine's Dealer Agreements did not contain an arbitration provision. Defendants admitted they did not retain the entire executed agreements for these parties; therefore, they could only provide what they had retained—page one of the agreement, which is a signature page, and pages fifteen and sixteen, which make up Exhibit B, the "Contract Pool Terms." The pages provided for ToGo and Sunshine are identical except for their names; both indicate they are version "v 1.14-July 2014." Even though CNRS&Z's agreement (v 1.8-April 2013) contained some differences from ToGo's and Sunshine's definitions of Contract Pool Terms found in Exhibit B, the entire blank agreement provided by Defendants in their February 2024

16

supplemental motion to compel contained an arbitration provision, an Exhibit B, and was sixteen pages long. Further, this version is the same as ToGo's and Sunshine's incomplete agreements—"v 1.14-July 2014." The trial court found Plaintiffs' contractual claims were subject to the arbitration clause, but the non-contractual claims were not.[14] We cannot say the trial court erred. We find the blank agreement with the same version reference (v 1.14-July 2014) sufficient to prove that ToGo and Sunshine signed Dealer Agreements containing arbitration provisions.

¶25.   As to Appellants' allegation that the contract consisted of only the three provided pages, the signed Exhibit B states that it "is made . . . to state the terms of the Contract Pool created by . . . the existing GO-Dealer Agreement." By its express terms, Exhibit B is not an entire contract, further stating it is "attached to and incorporated in the GO-Dealer Agreement."

¶26.   Moreover, these three pages alone cannot be considered a complete contract for other reasons. The pages are numbered fifteen and sixteen. The documents acknowledge there are "representations, warranties and covenants of the parties," but these provisions are not contained in the three pages. The excerpts contain undefined terms, which the documents state shall be defined in the GO-Dealer Agreement. Additionally, the excerpts do not require GFC Lending to provide the accounting Plaintiffs request. These last two points are important because they show Plaintiffs are requesting two remedies not contained in the

---

[14]  Defendants did not cross-appeal the finding on the non-contractual claims.

cover page and Exhibit B of their contracts. For example, Section 3.2 of the complete Dealer Agreement addresses backend payments in depth. Plaintiffs/Appellants seek to enforce contractual terms in the full Dealer Agreement while denying their arbitration obligation from section 10.10 of the same agreement.

¶27. Additionally, the trial court had no evidence to contradict that an arbitration provision was contained within ToGo's and Sunshine's Dealer Agreements. The affidavits of Hinton and Cullop were insufficient to prove arbitration was not agreed upon. The managers did not swear that there was no arbitration provision in the Dealer Agreements they signed or that they struck through or refused to sign it. The managers swore only that they "had no recollection" of signing an agreement with an arbitration provision. Further, as previously stated, Exhibit B, signed by ToGo and Sunshine, expressly states it "is made by GO and Dealer to state the terms applicable to the Contract Pool created by Dealer and GO pursuant to the existing GO-Dealer Agreement. This Exhibit B is attached to and incorporated in the GO-Dealer Agreement." By signing Exhibit B, Hinton and Cullop acknowledged it was part of a larger agreement that controlled the relationship between the parties.

¶28. Appellants cite *McFarland* as analogous. There, a customer purchased a vehicle from a BMW dealership, made payments, but never received the vehicle because the sales agent stole it. *McFarland*, 386 So. 3d at 384 (¶¶1, 4). When the customer sued the dealership, a signed arbitration agreement was produced by the dealership in support of its motion to compel arbitration. *Id.* at 385 (¶5). However, the customer submitted an affidavit swearing

18

she did not sign the arbitration agreement; her signature had been forged. *Id.* at 385, 387 (¶¶5, 15). This Court affirmed the trial court's denial of the defendants' motion to compel arbitration, finding the customer/plaintiff never signed the arbitration agreement. *Id.* at 387 (¶15). We found the only "proof" in support of arbitration was a copy of the agreement with the customer's signature, which she swore was forged, and there was no evidence presented contradicting her assertion of forgery. *Id.* Thus, there could be no mutual assent. *Id.* at 389 (¶21).

¶29.    Appellants claim that as in *McFarland*, there is no evidence that GFC Lending required arbitration agreements from all its dealerships or that if such provisions existed, ToGo and Sunshine did not modify or strike them because the entire Dealer Agreement was not provided. We find *McFarland* distinguishable: the customer affirmatively swore in her affidavit that she did not agree to arbitrate and that her signature was forged, *id.* at 387 (¶11), unlike here, where the dealership managers "had no personal recollection" of whether they signed an arbitration agreement. Further, Defendants provided evidence to contradict the affidavits—GFC Lending's blank Dealer Agreement of the July 2014 version signed by ToGo and Sunshine.

¶30.    The separate opinion contends that because Bridgecrest and DriveTime failed to put a complete written contractual arbitration agreement in the record for ToGo and Sunshine, we must reverse the decision to compel arbitration as to these two parties and remand for further proceedings because the "Court cannot enforce a contract when it simply does not

19

exist." Referring to the agreement of these two entities as "completely hypothetical contracts," the separate opinion quotes *KPMG LLP v. Singing River Health System*, 283 So. 3d 662 (Miss. 2018), for the statement that "the burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *Id.* at 674 (¶34) (quoting *Wellness Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (¶14) (Miss. 2015)). In that case, Singing River, a public hospital, sued its former auditors (KPMG) for breach of contract, negligence, and professional malpractice. *Id.* at 667 (¶13). KPMG filed a motion to compel arbitration, which the trial court denied. *Id.* at 664 (¶1). In affirming, the supreme court explained: "For well over a century, this Court has consistently held that public boards speak only through their minutes and that their acts are evidenced solely by entries on their minutes. . . . Like any other public board, a board of trustees of a community hospital is required to 'keep minutes of its official business.'" *Id.* at 669 (¶¶19-20) (citing Miss. Code Ann. § 41-13-35(3) (Rev. 2013)) (citations omitted). Over the years at issue, some of Singing River's minutes were "completely devoid" of any reference to KPMG's engagement letters, while other minutes made no mention of the terms or conditions of any agreement for audit services with KPMG. *Id.* at 672-73 (¶30). The supreme court held that "while the entire contract itself need not be placed on the minutes, 'enough of the terms and conditions of the contract' must be 'contained in the minutes for determination of the liabilities and obligations of the contracting parties without the necessity of resorting to other evidence.'

20

. . . Otherwise, the entire contract will be unenforceable." *Id.* at 670-71 (¶22) (citing *Thompson v. Jones Cnty. Cmty. Hosp.*, 352 So. 2d 795, 797 (Miss. 1977)) (citation omitted). Obviously, this case is distinguishable, as none of the parties before us are public entities requiring contractual details to be placed in their minutes.

¶31.   As previously discussed, under Mississippi law, an arbitration agreement does not have to be signed.  Submitting the complete blank agreement (v 1.14-July 2014) and the signature pages of ToGo and Sunshine to that same version was sufficient to prove a valid arbitration agreement existed, especially as the last two pages reference a complete agreement of which the pages are merely a part.[15]

¶32.   Third, Appellants claim arbitration is improper because Bridgecrest and DriveTime were not named as parties in the Dealer Agreements.  Instead, the contracts were with GFC Lending, LLC, doing business as GO Financial.  However, this fact does not invalidate the agreements.  In their complaint and appellate brief, Plaintiffs/Appellants acknowledge that GFC Lending changed its name to Bridgecrest and ceased to exist, and Bridgecrest's parent company is DriveTime.  Appellants admit they were notified of this change directly and that the loans would be serviced by Bridgecrest and DriveTime in the future.  Furthermore, we note Plaintiffs sued these two Defendants because they could not sue GFC Lending, as it no

---

[15]   Moreover, if the separate opinion's position were correct, we would need to reverse and remand for the trial court to render judgment on Plaintiffs' contractual claims. If there is no agreement between the parties, there is no way Plaintiffs can enforce any backend payments, as the majority of those provisions are in the agreement that "does not exist."

longer existed.

¶33. Mississippi law recognizes that "[a] non-signatory should have standing to compel arbitration where the non-signatory has a close legal relationship, such as alter ego, parent/subsidiary, or agency relationship, with a signatory to the agreement" or "if the doctrine of equitable estoppel applies."[16] *Sawyers v. Herrin-Gear Chevrolet Co.*, 26 So. 3d 1026, 1038 (¶32) (Miss. 2010) (quoting *B.C. Rogers Poultry v. Wedgeworth*, 911 So. 2d 483, 492 (¶30) (Miss. 2005)); *see also Qualcomm Inc. v. Am. Wireless License Grp. LLC*, 980 So. 2d 261, 269 (¶17) (Miss. 2007).

¶34. Appellants note that the arbitration provision in the Dealer Agreements expressly limits the resolution of disputes by arbitration to "the request of a party," and the Appellees were never a party to this agreement and are non-signatories. However, again we note that Plaintiffs' claims against Defendants arose from the Dealer Agreements, specifically their claim for backend payments defined in section 3.2 of the Dealer Agreements. Appellants are improperly seeking to enforce the Dealer Agreements against the entities they claim are not parties to those same agreements.

¶35. We agree with the parties that under the Dealer Agreements, Bridgecrest and

---

[16] *Accord Bridas S.A.P.I.C. v. Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) ("Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary."); *see also Adams v. Greenpoint Credit LLC*, 943 So. 2d 703, 708 (¶15) (Miss. 2006) (citing *Smith Barney Inc. v. Henry*, 775 So. 2d 722, 727 (¶19) (Miss. 2001)) ("[A]rbitration agreements can be enforced against non-signatories if such non-signatory is a third-party beneficiary.").

DriveTime cannot be considered third-party beneficiaries.[17]  However, Appellants contend

that Appellees, in an attempt to escape the agreements' third-party exclusion, unsuccessfully

claim an assignment under section 10.7 of the Dealership Agreements, which provides:

> Neither party may assign this Agreement or its rights hereunder to another person or entity without the express prior written consent of the other party . . . .  However, GO may retain one or more of its affiliates or third parties *to perform services required of GO by this Agreement* and GO may assign this Agreement to such affiliates or third parties without the prior consent of Dealer provided the affiliate or third party *expressly assumes GO's obligations* under this Agreement.

(Emphasis added).  Appellants argue that Appellees did not agree "to perform services

required of GO" or "expressly assume[] GO's obligations"; thus, there was no assignment

of the rights to Appellees within the Dealer Agreements.  However, if this were true,

Appellants would not have a contractual claim against Appellees.[18]

¶36.    In their brief and complaint, Appellants themselves described Bridgecrest and

DriveTime as the "'alter ego' or successor entity of the former 'GFC Lending, LLC' . . . that

conducted business under the trade name 'Go Financial.'"  We find that Bridgecrest and

DriveTime, if successors to GFC Lending as alleged in the complaint, created a "close legal

---

[17] The Dealer Agreements expressly prohibit third-party beneficiaries in section 10.5, entitled "Nature of Relationship," stating: "The relationship between Dealer and GO is that of an arm's length seller and purchaser of consumer installment sale contracts. . . .  This Agreement is for the sole benefit of Dealer and GO and no third parties are intended to be beneficiaries of or have any rights under this Agreement."

[18] Appellants also cite the Purchase and Sale Agreement, which allegedly did not provide for an assumption of obligations or assignment.  However, since it is not a part of the record on appeal, we cannot rely upon it.

relationship" that would allow them to enforce the arbitration provision, even though they are non-signatories to the Dealer Agreements.

¶37.    In the context of individuals, courts have found non-signatory "successors" to be bound by arbitration when specified under the terms of the agreement at issue.  We find these cases instructive.  In *Smith Barney*, the Mississippi Supreme Court found that a non-signatory, as successor under the terms of a will, was bound by an arbitration clause according to the terms of the deceased's securities client agreement.  *Smith Barney*, 775 So. 2d at 727 (¶20).  The *Smith Barney* court cited cases from other jurisdictions where non-signatory heirs and successors have been found bound by arbitration agreements under the terms of the agreement.  *Id.* at (¶19) (citing *Collins v. Merrill Lynch*, 561 So. 2d 952, 956 (La. Ct. App. 1990) (Non-signatory heirs of deceased brokerage firm customer were bound by arbitration agreement signed by both the deceased customer and firm.); *Smith Barney*, 775 So. 2d at 727 (¶19) (explaining that in *Herbert v. Superior Court*, 169 Cal. App. 3d 718, 724 (Cal. Ct. App. 1985), the appellate court held that a widow and her children were bound by an arbitration agreement signed by the children's father which purported to bind his 'heirs.'").

¶38.    Here, even though Bridgecrest and DriveTime were non-signatories to the Dealer Agreements, their close legal relationship with GFC Lending, as alleged in the complaint, allow them to enforce the arbitration clause.

¶39.    We conclude the trial court did not abuse its discretion in finding a valid arbitration

24

agreement existed for CNRS&Z, ToGo, and Sunshine.

## II. Appellees' Alternative Argument

¶40.   Alternatively to their argument that Plaintiffs/Appellants signed versions of the Dealer Agreement with an arbitration provision,[19] Appellees suggest that Appellants are bound to arbitrate under direct-beneficiary estoppel.  This principle usually "involves non-signatories who, during the life of the contract, have *embraced the contract* despite their non-signatory status, but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Scruggs v. Wyatt*, 60 So. 3d 758, 767 (¶21) (Miss. 2011) (quoting *Noble Drilling Servs. Inc. v. Certex USA Inc.*, 620 F.3d 469, 473 (5th Cir. 2010)).  "A non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Id.*  "In the arbitration context, equitable estoppel prevents a party from embracing the benefits of a contract while simultaneously trying to avoid its burdens." *Simmons Hous. Inc. v. Shelton*, 36 So. 3d 1283, 1287-88 (¶16) (Miss. 2010) (citing *Terminix*, 904 So. 2d at 1058 (¶28)).

¶41.   *Scruggs* is instructive on the principle of direct-beneficiary estoppel.  There, Derek Wyatt, an associate attorney of a law firm, sued the Scruggs law firm and its owner, claiming

---

[19]   Having already determined that the trial court did not err in finding Plaintiffs/Appellants agreed to arbitration, we address this alternative argument for the sake of completeness.

the firm failed to pay him for his share of fees for work completed under a joint-venture agreement created to bring lawsuits on behalf of individuals denied property insurance coverage from damage caused by Hurricane Katrina. *Scruggs*, 60 So. 3d at 760-61 (¶1). The agreement, which included an arbitration clause, involved Wyatt's and Scruggs's firm, as well as others; however, Wyatt individually was not a signatory to the agreement. *Id.* at 761-62 (¶¶4-5). The defendants filed a motion to compel arbitration, which the trial court denied because Wyatt did not sign the agreement, nor was he considered a third-party beneficiary. *Id.* at 761 (¶4). The Mississippi Supreme Court reversed the trial court's ruling, finding Wyatt's claims against the Scruggs Defendants were "directly dependent" on the agreement. *Id.* at 770 (¶28). The defendants argued that if Wyatt abandoned the agreement, his claims against them would not exist. *Id.* at 771 (¶29). Conversely, if Wyatt argued the agreement supported his claims, then the arbitration provision "taint[ed]" his contractual claims. *Id.* The court found under the direct-benefit estoppel theory that the non-signatory claimant, Wyatt, was required to arbitrate his claims against the Scruggs Defendants.[20] *Id.*

¶42.    In the case before us, Plaintiffs/Appellants, who "embraced" the Dealer Agreement, cannot seek a direct benefit from it while simultaneously repudiating the arbitration provision.

---

[20] In comparison, the Mississippi Supreme Court in *Singing River* merely held "a public board may not be bound by estoppel unless the agreement at issue is duly and lawfully entered upon its minutes." *KPMG*, 283 So. 3d at 676 (¶39) (citing *Butler v. Bd. of Supervisors for Hinds Cnty.*, 659 So. 2d 578, 582 (Miss. 1995)).

[A]lthough arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement cannot . . . "have it both ways": it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory.

*Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 528 (5th Cir. 2000) (citing *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir. 1999); *Hughes Masonry Co. v. Greater Clark Co. Sch. Bldg. Corp.*, 659 F.2d 836, 838-39 (7th Cir. 1981)). Here, Appellants cannot "have it both ways." They cannot hold Bridgecrest and DriveTime liable under the agreements yet ignore the arbitration provisions. As the *Grigson* court stated, "to allow such inconsistent positions would be inequitable. . . ." *Id.* We find such would be the case here if the arbitration provision were not enforced.

## CONCLUSION

¶43. The trial court did not err in finding CNRS&Z, ToGo, and Sunshine entered into a valid and binding arbitration agreement with GFC Lending that is enforceable. While Bridgecrest and DriveTime were non-signatories to the Dealer Agreements, their close legal relationship with GFC Lending, as alleged in the complaint itself, allows them to enforce the arbitration clause. Accordingly, we affirm the trial court's order granting Bridgecrest and DriveTime's motion to compel arbitration.

¶44. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., EMFINGER AND WEDDLE, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD,**

27

**LAWRENCE AND LASSITTER ST. PÉ, JJ.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶45. Because the financers failed to provide evidence that they had an arbitration agreement with all 3 of the used car dealers, we must reverse in part. Only *one* of the used car dealers had an arbitration contract that is actually in the record before us. As a result, we can safely affirm as to that one company. But we must reverse as to the other 2 companies when dozens of pages are missing from their agreements.

¶46. Three car dealerships contracted with GFC Lending for it to provide their customers with vehicle financing. GFC also operated under the name "GO Financial." GFC/GO Financial was later purchased by Bridgecrest. DriveTime is the parent company of Bridgecrest.

¶47. With all these different companies come different contracts. There are 3 different contractual documents at issue in this case. The first is between CNRS&Z and GFC; the second is between ToGo and GFC; and the third is between Sunshine and GFC.

¶48. In any arbitration case, "the parties seeking to invoke arbitration . . . bear the burden of establishing an agreement existed." *Gregory Meridian Acquisition LLC v. McFarland*, 386 So. 3d 381, 387 (¶13) (Miss. Ct. App. 2023).

¶49. The only "proof" from the financer-defendants to support finding an arbitration agreement (as to ToGo and Sunshine) consists of 3 pieces of paper, with pages numbered 1, 15, and 16. Page 1 is titled "Go-Dealer Agreement" and is a cover page with signatures

28

of ToGo and Sunshine (in separate, respective agreements). There is no mention of arbitration *at all*. Pages 15 and 16 are "Exhibit B - Contract Pool Terms," containing the signatures of ToGo and Sunshine, respectively. Again, there is no reference to any arbitration agreement. We have no idea what is in pages 2–14.

¶50.    The managing members of the car dealerships, Frances Cullop and Clayton Hinton, each filed an affidavit opposing arbitration. In Hinton's affidavit, he attested ToGo "does not have any record of ever si[g]ning any agreement containing an arbitration provision with GFC Lending;" and "I have no personal recollection of ever signing any agreement with an arbitration provision . . . on behalf of ToGo Motors." Further, "[t]he only agreement I recall entering into on behalf of To[G]o Motors was with GFC Lending, titled 'Contract Pool Terms,' identified as pages 15 and 16 of Defendants' Motion Exhibit 'A.'" Cullop executed an affidavit on behalf of Sunshine that was identical to Hinton's.

¶51.    The trial court had *zero* evidence contradicting the sworn proof in these two affidavits. Again, not only did these two corporate officers swear they did not sign an arbitration agreement—there is not one in the record.

¶52.    Instead, the financing companies attempt to convince this Court that an arbitration agreement exists with ToGo and Sunshine based on CNRS&Z's *separate* GO-Dealer Agreement. They want us to read into the record a blank copy of the version of the agreement existing at the time that ToGo and Sunshine allegedly signed it.

¶53.    But the financers cannot just "copy/paste" between these different contracts to make

29

a new contract. These contracts are between different companies and executed at different times—the direct opposite of what our laws generally allow to be enforced in this way. "[U]nder general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." *Doleac v. Real Est. Profs. LLC*, 911 So. 2d 496, 504 (¶26) (Miss. 2005) (quoting *Neal v. Hardee's Food Sys. Inc.*, 918 F.2d 34, 37 (5th Cir. 1990)).

¶54. CNRS&Z's Agreement was signed in September 2013, a year and a half before ToGo and Sunshine signed their agreements in January 2015. Also, the CNRS&Z Agreement was signed by "Vice President" Frances Cullop. Meanwhile, the ToGo documents were signed by "managing member" Clayton Hinton, and the Sunshine documents were signed by "managing member" Cullop. Furthermore, the Agreement executed by CNRS&Z was version "v 1.8-April 2013," but the documents signed by ToGo and Sunshine are labeled as version "v 1.14-July 2014."

¶55. So, the contracts here were 3 separate agreements that were executed at different times, by different parties, and as different transactions. Therefore, it is improper to construe the CNRS&Z Agreement together with the ToGo and Sunshine documents.

¶56. Furthermore, while "there is a strong federal policy favoring arbitration," our Supreme Court has held that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Adams v. Greenpoint Credit LLC*, 943 So. 2d 703,

708 (¶14) (Miss. 2006) (quoting *Pre-Paid Legal Servs. v. Battle*, 873 So. 2d 79, 83 (Miss. 2004)). "[N]othing in the Federal Arbitration Act authorizes a court to compel parties *not covered* by the agreement to arbitrate their claims." *Id*. at 707-08 (¶13) (emphasis added). The CNRS&Z Agreement clearly does not cover ToGo or Sunshine because they were not parties to that agreement. In a sense, ToGo and Sunshine were each "a total stranger to the contract and its arbitration clause." *Id*. at 707 (¶13). Consequently, the CNRS&Z contract terms cannot be used to compel ToGo or Sunshine to arbitrate.

¶57. Lastly, the lead opinion is candid that the sellers and financers do not all have the same contract, recognizing that the only "complete, seventeen-page Dealer Agreement between GFC Lending and CNRS&Z, which included a mandatory arbitration provision," simply "was not signed at the end by an authorized representative of GFC Lending or initialed on each page, as CNRS&Z had done." And all parties agree we have never even seen the complete contracts "between GFC Lending and ToGo, as well as Sunshine"—only "the executed first and the last two pages[.]"

¶58. That's exactly why we cannot enforce the completely hypothetical contracts at issue here that are simply not in the record. For "[t]he burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *KPMG, LLP v. Singing River Health Sys*., 283 So. 3d 662, 674 (¶34) (Miss. 2018).

¶59. The *KPMG* case dealt with a contract specifically in the context of a hospital's board

31

of trustees. *Id*. "KPMG is one of the largest audit, tax, and advisory firms in the United States," and it had "audited [the hospital system] Singing River's financial statements from 1978 to 2012." *Id*. at 664 (¶2). Singing River ended up suing KPMG, arguing that it had committed negligence in the work it was contracted to do for the hospital. *Id*. at 667-68 (¶¶13-14). KPMG immediately "filed a motion to compel arbitration and to stay the proceedings pending arbitration." *Id*. at 668 (¶15).

¶60. The Supreme Court explained that "enough of the terms and conditions of the contract" must be "contained in the minutes for determination of the liabilities and obligations of the contracting parties without the necessity of resorting to other evidence[;]" "[o]therwise, the entire contract will be unenforceable." *Id*. at 670-71 (¶22).

¶61. On appeal, the Court found "[t]he Committee's minutes demonstrate, at most, that KPMG was engaged to perform an audit and was to be paid an unknown fee. But the substance of the letter, including the details, terms, and conditions, were not stated with any clarity or specificity." *Id*. at 672 (¶27). Further, "[t]he obligations and liabilities of KPMG and Singing River cannot be determined either by the Board's or by the Committee's minutes." *Id*. It concluded that as a result, "KPMG's 2008 [engagement] letter cannot be enforced, nor can the separately attached dispute-resolution provision." *Id*.

¶62. Just like that cause, where KPMG failed to follow basic principles of recording a contract, here, the financers failed to put in the record a written, contractual arbitration agreement between themselves and ToGo and Sunshine.

¶63. Because Bridgecrest and DriveTime failed to meet their burden of proving a valid, enforceable agreement to arbitrate as to the companies ToGo and Sunshine, we must reverse the decision to compel arbitration as to these two parties. This Court cannot enforce a contract when it simply does not exist. And we certainly cannot cover for a party when they have failed to maintain records of the rights they now seek to enforce.

**WESTBROOKS, McDONALD, LAWRENCE AND LASSITTER ST. PÉ, JJ., JOIN THIS OPINION.**